Submitted on briefs January 25, affirmed February 13, rehearing denied April 17, costs disallowed either party May 22, 1923.

## OREGON GROWERS' CO-OPERATIVE ASSO-CIATION *v.* LENTZ ET AL.

(212 Pac. 811.)

**Courts—Stipulation by Parties That Court has Jurisdiction, Though Illegal, Does not Defeat Jurisdiction Under Constitution.**

1. Though a stipulation in a contract that, on breach by defendant, plaintiff should be entitled to an injunction and to a decree for specific performance, was illegal, plaintiff may be awarded such relief by the Circuit Court, where, irrespective of such stipulation, such court has jurisdiction of the cause and of the parties under the Constitution and laws of the state.

---

Combination among produce buyers as monopoly, see note in 12 L. R. A. (N. S.) 150.

**Statutes—Statute Regulating Contracts of Co-operative Marketing Associations With Members not Special Law.**

2. Section 6954, Or. L., as amended by Laws of 1921, page 486, providing that stipulations for liquidated damages for breach of contract by members of co-operative marketing associations should be valid, and giving such associations the right to injunctive relief for threatened breach, and specific performance is not special legislation within Constitution, Article IV, Section 23, subd. 3; the statute being general in its application to all co-operative associations.

**Constitutional Law—Statute Permitting and Regulating Co-operative Associations Held not to Grant Special Privileges or Immunities.**

3. Section 6954, Or. L., as amended by Laws of 1921, page 486, giving co-operative associations the right to stipulate in by-laws and in contracts with members for liquidated damages for breach of contract to sell all products to the association, and providing for specific performance and injunctive relief to enforce such contracts, does not violate Constitution, Article I, Section 20, prohibiting laws granting to any citizens privileges or immunities not equally belonging to all citizens.

**Monopolies—Statute Permitting and Regulating Co-operative Associations Held not to Create a Monopoly.**

4. Section 6954, Or. L., as amended by Laws of 1921, page 486, giving co-operative associations the right to stipulate in by-laws and in contracts with members for liquidated damages for breach of contract to sell all products to the association, and providing for specific performance and injunctive relief to enforce such contracts, does not create a monopoly.

**Statutes—Amendment must be of Matter Properly Included Under Original Act.**

5. In amending a statute it is only necessary that the title to the amendatory act shall refer to a particular section of an official compilation of laws, and the amendment will not be contrary to Constitution, Article IV, Section 20, that "every act shall embrace but one subject, and matters properly connected therewith, which subject shall be embraced in the title," unless the provision of the amendment could not have been included in the original act.

**Statutes—Amendment to Statute Concerning Co-operative Marketing Associations Held Within Title of Act.**

6. The title of Laws of 1915, page 308, "to provide a method whereby producers and consumers may organize into a co-operative association for the purpose of more effectively managing their own business on the co-operative plan, providing a way whereby one small co-operative association may identify itself with a greater co-operative association, or merge therewith, and furnish a complete method for the government of such organization or associated organizations," is sufficiently comprehensive to include Laws of 1921, page 486, amending Section 6954, Or. L., a part of such original act, incorporating into such act a provision declaring that stipulations in contracts between co-operative marketing associations and

their members for liquidated damages for breach by such members of marketing contracts shall be valid, and affording the associations remedies by injunction and specific performance in cases of breach.

**Equity—Equitable Relief Granted Though Contract Concerns Personalty, Where Remedy at Law is Inadequate.**

7.   Where the remedy at law is adequate, equitable relief will be denied; but, if the remedy at law is inadequate, equitable relief will not be denied because the subject matter of the contract is personalty and not realty.

**Injunction—Damages at Law Held Inadequate Remedy for Breach of Contract to Sell All Products Grown to Co-operative Association.**

8.   Where a grower who had contracted to sell his products to a co-operative marketing association of which he was a member refused to carry out the contract, *held,* in view of the perishable nature of these products, the uncertainty of market conditions, the limited time in which the business of each season must be concluded, and the necessity that the association enter into contracts for the disposal of these products, an action for damages was not an adequate remedy, so that injunctive relief was properly granted.

**Sales—Land on Which Crop Sold is to be Grown may be Identified by Extrinsic Proof.**

9.   A contract for the sale to a co-operative marketing association of products raised on a certain piece of land need not describe the land with such accuracy that it can be identified from the contract alone, the description being sufficient if it can be identified by extrinsic proof.

**Contracts—Illegality must be Pleaded and Proved.**

10.   Where a contract is legal on its face, its illegality must be alleged and proved; the presumption being that all contracts are legal.

**Injunction—Though Member of Marketing Association might not be Compelled to Raise Crop or to Sell It, He may be Restrained from Selling to Others in Violation of His Contract.**

11.   Even if a contract by defendant, a grower of loganberries, to sell all products grown during specified years on his land to a co-operative marketing association, could not be specifically enforced by compelling defendant to raise the loganberries or by compelling him to sell the berries to plaintiff, the marketing association, if it was not his intention to so sell them, plaintiff would be entitled to restrain defendant from selling the berries to persons other than plaintiff.

**Injunction—Injunction will be Dissolved on Failure of Plaintiff to Perform His Part of Contract.**

12.   A mandatory injunction to obtain specific performance of a contract will remain in force only so long as plaintiff performs his part of the contract, and, if he fails to do any act he has agreed to perform, the injunction will be dissolved.

**Sales—Lease of Land Does not Relieve Owner or Lessee from Contract for Sale of Crops.**

13.    Where a grower contracted to sell all his products to a co-operative association, and after two years he leased the land to his son, a minor, who had notice of the contract, the lease did not relieve the grower or his son from delivering under the contract.

**Injunction—Specific Performance—Breach of Contract by Plaintiff Defeating Remedy must be Pleaded in the Answer.**

14.    In an action by a co-operative marketing association against one of its members to restrain defendant from selling his crop to others than plaintiff in violation of a contract for the sale of the crop for five years, and for specific performance, a contention by defendant that plaintiff improperly charged defendant with a proportion of the losses suffered by plaintiff during one of the years covered by the contract was unavailing, where the right to make such deduction was not negatived in defendant's answer.

**Sales—Contract for Sale of Crops for Years not Severable.**

15.    Where a grower has contracted to sell his products for a period of years to a co-operative marketing association and the association refuses to pay for all the products delivered in one year, the grower is released from further performance on his part; the contract not being severable for each year.

**Injunction—Writ Granted Only as to Part of Contract Breached or as to Threatened Breach.**

16.    Where a grower who has entered into a contract to sell the products of all his land within the state to a co-operative marketing association commits a breach of contract by selling the products of nineteen acres to others, an injunction will be granted only in respect to the nineteen acres and not as to all his land until actual or threatened breach.

**Injunction—Specific Performance—Court not Bound to Grant Relief Stipulated for in Contract in Case of Breach.**

17.    In a suit for specific performance and injunction against threatened breach, a court is not bound to grant the relief stipulated for by a contract for its breach, unless under the particular circumstances the granting of such relief would be in accordance with the established principles of equity.

From Marion: GEORGE G. BINGHAM, Judge.

In Banc.

The plaintiff brought suit against the defendant August Lentz for the specific performance of a contract entered into between the plaintiff and defendant on April 22, 1920, and for an injunction enjoining him from selling any of the loganberries mentioned

and described in the contract, to anyone other than the plaintiff, as provided by said contract.

The plaintiff is a co-operative, marketing association, organized pursuant to Chapter 6 of Title XXXIX of the Code, comprising sections 6954 to 6981, inclusive, Or. L. The association is composed exclusively of persons who are actual producers of agricultural or horticultural products, and is not conducted for profit. The purpose for which it was instituted was for the mutual benefit of its members, all of whom have executed contracts with the plaintiff similar to defendant's contract.

The contract itself is an agency contract and appoints plaintiff as agent of the defendant August Lentz to market his product for his benefit, and without profit to the association. The period covered by the contract includes the years 1920 to 1924, both inclusive. The subject matter of the contract is the sale and disposal of loganberries grown by or for the defendant.

The complaint alleges the corporate existence of the plaintiff; the objects and purposes for which it was formed; that the defendant is a grower of loganberries and is a stockholder in the association; that he entered into a contract with the plaintiff and performed it upon his part during the years 1920 and 1921, but had failed and refused to perform during the year 1922, prior to the commencement of the suit, and that all of the stockholders, as well as the plaintiff, are growers of like or similar products and have entered into like contracts with the plaintiff. It sets forth *verbatim* a copy of the contract and alleges that the plaintiff has no plain, speedy or adequate remedy at law. The complaint prays that the defendant be compelled to specifically perform the contract

and that he be enjoined from selling the logan-berries contracted for, to anyone other than the plaintiff.

By their answer the defendants admitted the execution of the contract by August Lentz, but denied the other allegations of the complaint, and affirmatively alleged that the defendant, on or about January 1, 1922, leased his premises to his codefendant, Benjamin Lentz, who was not a party to the contract, and that Benjamin Lentz, and not August Lentz, had complete charge and control of the production and disposal of the loganberries produced during the year 1922, and had harvested and disposed of the same, and that the defendant August Lentz had no power to control the sale or disposal thereof.

The reply denied all of the averments contained in the answer. The contract attached to and made a part of the complaint reads as follows:

"This agreement between the Oregon Growers' Co-Operative Association, a non-profit, non-capital stock Oregon corporation, with its principal office at Salem, Oregon, hereinafter called the Association, first party, and the undersigned grower or growers in said State, hereinafter called the Grower, second party, Witnesseth:

"In consideration of the mutual obligations herein and of the admission of the Grower to membership in the Association, and in pursuance of the Articles of Incorporation and By-laws thereof and of the express aims of the Association for co-operative marketing, for eliminating speculation and waste and for stabilizing the food markets and in accordance with similar obligations undertaken by other Growers:

"First—The Association agrees to buy and the Grower agrees to sell and deliver to the Association all of the agricultural or horticultural products, of the varieties specified below, grown by or for him,

or acquired by or for him at any place in Oregon, during the years 1920-1921-1922-1923-1924, that he intends to sell or market or consign or deliver directly or indirectly for sale or marketing or consignment to any person or corporation whatsoever.

"Second—The Grower expressly warrants that he has not heretofore contracted to sell, market, consign or deliver any of his said products to any person, firm or corporation, except as noted at the end of this agreement. Any products covered by such existing contract shall be excluded from the terms hereof for the period and to the extent noted.

"Third—The association agrees to resell such products, in their original form, or dried or canned or preserved, or as by-products or otherwise, together with similar products or by-products, delivered by other growers under similar contracts, at the best prices obtainable under market conditions, all in the Association's discretion, and to pay over the net amounts received thereby as payment in full, to the Grower and Growers named in contracts generally similar to this contract, according to the resale value of the products delivered by each of the Growers, after deducting therefrom the costs of maintaining the Association and of transporting, handling, processing, manufacturing, selling, storing, marketing products or by-products and other activities, and also reserves for advertising and other general commercial purposes, said reserves not to exceed 2% of the gross retail price, all within the sole and conclusive discretion of the Association.

"Fourth—The Association may contract in advance for the sale of the products of the Grower, or any part thereof; sell the same to canners, packers, commission houses, brokers or others at wholesale or retail, at auction or otherwise, before or after canning or processing, within or without this State; contract for the marketing of such products or their by-products through such commission houses or brokers or agents, as the Association may select, upon consignment or otherwise; to fix a fair and reasonable price or prices

at which such products or by-products may be sold and below which none shall be sold, and to fix all such terms and conditions as the Association may deem advisable.

"Fifth—The Association may establish selling agencies or auction places in any city and all products consigned or delivered to the markets of that city are subject to the terms and conditions herein provided and to such other equitable conditions as the Association may establish for each local selling agency or auction.

"Sixth—(a) The Grower agrees that all products delivered hereunder shall be free from damage of any kind and in good marketable and merchantable condition and shall be delivered to the Association as, when and where directed.

"(b) The Association may make rules and regulations and provide inspectors to standardize the quality, method and manner of harvesting, handling, packing and shipping of such products for direct sale or for any particular purpose; and the Grower agrees to observe and perform any such rules and regulations prescribed by the Association.

"(c) All products delivered to or at the order of the Association hereunder shall be of the standard and conform to the regulations as to quality and otherwise that may be prescribed by the State and Federal authorities and by the Association.

"(d) Any deduction or allowance or loss that the Association may make or suffer on account of inferior quality or standard, or condition at delivery, shall be charged against the Grower and be deducted from his net returns hereunder.

"Seventh—The Grower agrees to ship and return all boxes, delivered to him for his use and convenience, as and when directed by the Association, and in the event of his failure so to do, to pay to the Association therefor the value of each box not shipped or returned as and when ordered, as conclusively determined by the Association; and the Grower here-

with authorizes the Association to deduct any such charge from his net returns hereunder.

"Eighth—The Grower shall have the right to plant any crop at any time in his free discretion; but if the Grower produces any agricultural or horticultural products which come within the scope of the Association's activities as established by contracts or by notice, or acquires or owns an interest in any thereof, during the term hereof, they shall all be included under the terms of this agreement and must be sold only to the Association.

"Ninth—The Association is expressly empowered to contract with a cannery or canneries whereby all products which, in its judgment, should be offered for packing, manufacturing into by-products, canning or preserving, shall be sold or used for such purposes under fair and reasonable conditions; or to contract with a broker or commission house for the sale of products; or itself to can or process or pack or otherwise dispose of such products.

"Tenth—The Grower agrees to ship directly to any packing house, drier, cannery, factory, auction or commission house or broker or other person, such percentage of his daily shipments as the Association may direct, packed as the Association may instruct.

"Eleventh—The Association may, for any purposes herein, pool or mingle products of the Grower with products of a like grade and variety from similar districts, all as determined by the Association, delivered by other growers named in contracts generally similar to this contract; and the Grower agrees that his products may be so mingled, and that the returns therefrom, less all costs, advances and charges, as set forth in paragraph III hereof, shall be credited and paid to him on a proportional basis out of the receipts from the sale, marketing, canning or other disposal of all such products of like variety and grade, all as and when determined by the Association.

"Twelfth—The Grower further agrees that the Association shall have the power, without limitation, to

borrow money in its name and on its own account for any purpose on the products delivered to it or on the products therefrom or on any accounts for the sale thereof or on any drafts, bills of exchange, notes, or acceptances, orders or any commercial paper delivered therefor; and to exercise all rights of ownership without limitation and to pledge in its name and on its own account such products or accounts or drafts, bills of lading, notes, acceptances, orders or other commercial paper, as collateral therefor. The Association shall have the right to prorate the money so received to the growers upon whose variety of products said moneys were borrowed (if distinguishable), and to pay to each grower his proportionate amount thereof or in its absolute discretion to lend the same in any equitable and safe manner to growers needing such assistance or to use the same for any proper Association purpose or activity.

"Thirteenth—The Grower expressly agrees that the Association may handle, in its discretion, some of the said products in one way and some in another; but the net proceeds of all products of like variety and grade from similar districts, less all charges, shall be divided ratably among the growers in proportion to their deliveries or shipments of such varieties and grades. Such division or distribution shall be made from time to time, in such amounts as the Association may deem advisable, until all the accounts of the season are completely settled.

"Fourteenth—The Grower hereby expressly authorizes the Association to deliver to the Oregon Growers Packing Corporation, organized for practical co-operation with the Association, any or all of his products under a long term contract or at a price to be fixed for the season, or at the resale price thereof, less all proportionate costs of delivery, canning, advertising, storing, selling, taxes, brokerage, insurance, administration, legal expenses, organization, interest on investment, depreciation, retirement of 20 per cent of the preferred stock annually, creation of a cash reserve for general commercial

purposes, and of a reserve to retire preferred stock and of an experiment and betterment fund, and payment of a 7 per cent dividend on all outstanding preferred stock, and of a reasonable dividend, not to exceed 10% per annum on the common stock thereof, and less such other costs, charges or advances and on such other or different terms and conditions as the Association, in its conclusive judgment, may deem advantageous and profitable to its grower-members; and the Grower hereby authorizes the Association to enter into any contract for such consideration and on such terms and conditions as it may deem advisable and profitable for the canning, preserving, packing, manufacturing, storing, warehousing of the products covered hereby, or any portion thereof, and for the use of the security thereof as collateral within the general purposes of this agreement by this Association or by such corporation in its name under such protective provisions as this Association may deem proper.

"Fifteenth—This agreement shall be binding upon the Grower, his representatives, successors and assigns, during the period above mentioned, as long as he raises agricultural or horticultural products, directly or indirectly, or has the legal right to exercise ownership or control of any thereof or any interest therein or of any land on which such products are grown during the term of this contract.

"Sixteenth—This agreement is one of a series generally similar in terms, comprising, with all such agreements, signed by individual Growers, one single contract between the Association and the said Growers, mutually and individually obligated under all of the terms thereof. The Association shall be deemed to be acting, in its own name, for all of such Growers in any action or legal proceeding on or arising out of this contract.

"Seventeenth—If the Association brings any action to enforce any provisions hereof or to secure specific performance hereof or to collect damages of any kind for any breach hereof the Grower agrees to pay to

the Association all costs of court, costs for bonds and otherwise, expenses of travel and all expenses arising out of or caused by the litigation and any reasonable attorney's fee expended or incurred by it in any such proceedings and all such costs and expenses shall be included in the judgment and shall be entitled to the benefit of any lien securing any payment hereunder.

"Eighteenth—Inasmuch as the remedy at law would be inadequate and inasmuch as it is now and ever will be impracticable and extremely difficult to determine the actual damage resulting to the Association should the Grower fail so to consign and deliver all of his products, the Grower hereby agrees to pay to the Association for all products sold, consigned or marketed by or for him other than in accordance with the terms hereof, as liquidated damages for the breach of this contract, the amount set forth on the schedule below, all parties agreeing that this contract is one of a series dependent for its true value upon the adherence of each and all of the contracting parties to each and all of the said contracts.

"Nineteenth—The Grower agrees that in the event of a breach by him of any material provision hereof, particularly as to delivery or marketing of any products other than to or through the Association, the Association shall, upon proper action instituted by it, be entitled to an injunction to prevent further breach hereof and a decree for specific performance hereof, according to the terms of this agreement; and the Association and the Grower expressly agree that this agreement is not a contract for personal services or demanding exceptional capacity or talents; and that this is a contract for the purchase and sale of personal property under special circumstances and conditions and that the buyer cannot go into the open markets and buy products to replace any which the Grower may fail to deliver; and that this contract will be the proper subject for the remedy of specific performance in the event of a breach thereof.

"Twentieth—On or before April 1st of the year 1920, and each year thereafter, the Grower will mail to the Association a statement of his expected acreage of all horticultural and agricultural products of the varieties specified below for that year on the form provided for that purpose by the Association, and only such varieties of products as specified shall be covered by this agreement.

"Twenty-first—The parties agree that there are no oral or other conditions, promises, covenants, representations or inducements in addition to or at variance with any of the terms hereof and that this agreement represents the voluntary and clear understanding of both parties fully and completely.

"Read, considered and signed by the Grower this 22 day of April, 1920, at Salem, Oregon. (Sgd.) A. Lentz, Grower, Salem, Rt. 5: Do not sign without reading.

"By authority of a resolution of the Board of Directors of the Association adopted on July 1919 this agreement is approved, accepted and executed. Salem, Oregon, April 22, 1920. Oregon Growers' Cooperative Association. By (Sgd.) W. I. Staley, Secretary.

"Subject to case pending in the Supreme Court.

"Growers present acreage in Oregon of products subject to this contract: 15 acres of Logans. B. located at Salem. 4 acres of Logans. N. B. located at Salem.

"Schedule of Liquidated Damages. $15.00 per green ton of Canning Fruits. $5.00 per green ton of Drying or Canning Vegetables. $15.00 per green ton of Drying Fruits. $10.00 per ton of shipping or fresh Vegetables. 50 cents or proportionately per box of Shipping Fruits. 2 cents per pound of all Cherries. 2 cents per green pound of Berries. 50 cents or proportionately per crate of Shipping Berries. 5 cents per pound of Nuts.''

Upon the trial of the cause the Circuit Court rendered its decree enjoining the defendants, until January 1, 1925, from selling, delivering or consign-

ing any of the loganberries produced or grown by or for them or either of them upon the nineteen acres of land mentioned and described in the complaint. Both parties have appealed from the decree.

AFFIRMED.

REHEARING DENIED. COSTS DISALLOWED EITHER PARTY.

For appellants there was a brief over the name of *Mr. Walter C. Winslow.*

For respondent and cross-appellant there was a brief over the names of *Messrs. Dey, Hampson & Nelson* and *Mr. C. J. Young.*

RAND, J.—1. Upon their appeal the defendants contend that because the contract in terms provides that in the event of a breach by the defendant August Lentz of any of the material provisions of the contract, the plaintiff shall be entitled to an injunction restraining the defendant August Lentz from any further breach thereof and to a decree for the specific performance of the contract, and stipulates that in such case the contract itself is a proper subject for the remedy of specific performance, the trial court had no jurisdiction to grant the relief awarded, since "parties cannot by consent or stipulation invest a court with jurisdiction or power not authorized by law or conferred upon it by the Constitution." 11 Cyc. 673; *McLaughlin* v. *Aumsville Mercantile Co.,* 74 Or. 80 (144 Pac. 1154). While it is not within the power of litigants to invest a court with any jurisdiction or power not conferred on it by law, and if the court is without jurisdiction of the cause of suit or subject matter involved in a particular case, such

jurisdiction cannot be conferred by consent, agreement or waiver: 15 C. J., p. 802, yet the legal principle was not applicable because the trial court had full and complete jurisdiction of the subject matter involved and of the parties to the suit, independently of any provision of the contract.

Under the Constitution and laws of this state, Circuit Courts are courts of original jurisdiction having full and complete power to award equitable relief in all proper cases. Such courts have jurisdiction and power to enjoin the breach of a contract and to compel the specific performance thereof at the suit of an injured party whenever such party is equitably entitled to such relief. The power and jurisdiction of the Circuit Court to hear and determine the question, of whether the defendant has breached his contract and to award equitable relief in a proper case where a breach has occurred, exists independently of this or any other contract. The exercise of this power and jurisdiction by the court in this case was not in any way, nor to any extent, dependent upon the provisions of the contract above referred to, and the relief granted would have been proper if the provisions referred to had not been incorporated into the contract.

2. Section 6954, Or. L., as amended by Chapter 260, Laws of 1921, contains, among others, the following provisions:

"The by-laws and marketing contract may fix, as liquidated damages, specific sums to be paid by the member to the association upon the breach by him of any provision of the marketing contract regarding the sale or delivery or withholding of products; and any such provisions shall be valid and enforceable in the courts of this state.

"In the event of any such breach or threatened breach of such marketing contract by a member, the association shall be entitled to an injunction to prevent the further breach of the contract, and to a decree of specific performance thereof. Pending the adjudication of such suit, the association shall be entitled in a proper case to a temporary restraining order or preliminary injunction against the member."

Defendants argue that so far as this statute attempts to confer jurisdiction upon the courts to grant injunctive relief and compel specific performance of a contract against a member of such association who has breached or threatened to breach his contract, it is special legislation and falls within the prohibition of subdivision 3, Section 23, Article IV of the Constitution of this state, which provides: "The legislative assembly shall not pass special or local laws * * regulating the practice in courts of justice."

In numerous cases the word "special," as employed in this constitutional provision, has been defined by this court, of which it is necessary to cite but one. In *Farrell* v. *Port of Columbia,* 50 Or. 169 (91 Pac. 546, 93 Pac. 254), this court, speaking through Mr. Chief Justice R. S. BEAN, said:

"And, when it [the word 'general'] is used in contradistinction to 'special,' it signifies relating to the whole community or all of a class instead of to a particular locality or a part of a class. In this latter sense a law is general when it operates equally and uniformly upon all persons, places or things brought within the relation and circumstances for which it provided. But when it is applicable only to a particular branch or designated portion of such persons, places or things, or is limited in the object to which it applies, it is special: *Lippman* v. *People,* 175 Ill. 101 (51 N. E. 872); *Wheeler* v. *Pennsylvania,* 77 Pa.

338; 26 Am. & Eng. Enc. Law (2 ed.), 532; 1 Lewis' Sutherland Stat. Const., § 195. It is in this sense that the terms 'general' and 'special' are used in the provision of the constitution now under consideration. * * A general law, within this section of the constitution, is one by which all persons or localities complying with its provisions may be entitled to exercise the powers and enjoy the rights and privileges conferred. A special law, on the other hand, is one conferring upon certain individuals or citizens of a certain locality rights and powers or liabilities not granted to, or imposed upon, others similarly situated.''

The legislature has the power to enact laws which are applicable to all of a particular class of persons or things and not applicable to a different class of persons or things. Such legislation is general and not special. If this were not true, a very large proportion of the statute law would be void. ''A statute relating to persons or things as a class is a general law; one relating to particular persons or things of a class is special.'' 1 Lewis' Sutherland Stat. Const. (2 ed.), § 195.

3, 4. As this statute operates generally upon all co-operative associations throughout the state, and not upon a part of them only, and confers upon all alike the right to exercise the same powers and to enjoy the same rights and privileges, and did not grant to any particular co-operative association any different rights or powers, nor impose any different liabilities from those granted to and imposed upon all others similarly situated, the statute is general and not special within the meaning of those words as used in the Constitution. And as it is a general statute applying equally and uniformly to all co-operative associations alike, the statute does not

107 Or.—37

operate to create a monopoly as argued by the defendant, nor is it violative, as is also argued by the defendant, of Section 20, Article I of the Constitution, which provides that "No law shall be passed granting to any citizen or class of citizens, privileges or immunities which, upon the same terms, shall not equally belong to all citizens."

5. The above quoted provisions of the statute first appear in Chapter 260, L. 1921, which chapter was amendatory of Section 6954, Or. L., and other sections. As so amended, Section 6954, Or. L., introduced into the statute for the first time, the provisions referred to.

Defendant contends that these provisions are not germane to the subject matter of the original act, and therefore this portion of the statute is violative of Section 20, Article IV of the Constitution, which requires that "Every act shall embrace but one subject, and matters properly connected therewith, which subject shall be expressed in the title." The title to Chapter 226, Laws of 1915, which was the original act, in part reads as follows: "To provide a method whereby producers and consumers may organize into a co-operative association for the purpose of more effectively managing their own business on the co-operative plan, providing a way whereby one small co-operative association may identify itself with a greater co-operative association, or merge therewith, and furnish a complete method for the government of such organization or associated organizations." The title to Chapter 260, Laws of 1921, the amendatory act, amending Section 6954, Or. L., and other sections, reads: "To amend Sections 6954," etc. * * "Or. L., relating to the organization of co-operative associations."

6. In amending a statute it is only necessary that the title to the amendatory act should refer to a particular section of an official compilation of laws: *State* v. *Phenline,* 16 Or. 107 (17 Pac. 572). And the amendment will not be objectionable to Section 20, Article IV of the Constitution, unless the provisions of the amendment are such as could not have been included in the original act: *Ex parte Howe,* 26 Or. 181 (37 Pac. 536).

We think that the title to Chapter 226, Laws of 1915, the original act, was sufficiently comprehensive to include the provisions of the amendment referred to, and that these provisions were germane to the subject of the original act, and that if these provisions had been embodied into the original act, and this objection had then been made, the objection could not have been sustained.

7. Defendant contends that the plaintiff is not entitled to equitable relief because the contract in terms provides for the recovery of stipulated damages upon breach thereof by the defendant. It is obvious that if the plaintiff has a full, complete and adequate remedy at law, it is not entitled to equitable relief, but if its remedy at law is not full, adequate and complete, then it is entitled to equitable redress, and this remedy will not be defeated because of the fact that the subject matter of the contract is personalty and not realty.

8. As stated, the plaintiff is a co-operative, marketing association and is not conducted for profit. Its members are composed exclusively of growers of horticultural and agricultural products. The defendant is himself a member of the association, and has contractual relations with it. These contracts are all similar in terms and constitute the association as the

agent of the members to dispose of and market their products for the mutual benefit of the members and without profit to the association. Its success, therefore, and the benefits to be derived by the members thereof, is wholly dependent upon the performance, by all of the contracting parties, with the terms and conditions of their respective contracts. In order to carry out the objects and purposes for which it was organized, it is necessary for the association to enter into contracts for the disposal of the products of its members. Before it can safely make such contracts, it must be assured that it will obtain the products contracted for. It must also be able to form a reasonable estimate, in advance, of the amount of products which will be grown on the acreage stipulated, and maintain a sufficient organization and force to prepare the same for market. It is also necessary to secure the capital or credit required to discharge its obligations to the growers and to conduct and carry on its business. The perishable nature of the products handled, the uncertainty of the market conditions and prices, its inability to buy these products from nonmembers, and the limited time in which its business for each season must be conducted and completed, makes it essential that each member of the association should perform his contract according to its terms. From these considerations, it must be obvious that an action at law to recover the stipulated damages would not afford to the plaintiff a full, adequate and complete remedy for the wrong done to the association, and indirectly to its members by a member's breach of his contract.

9. Defendant also contends that the contract in controversy is void for uncertainty in that the description of the nineteen acres of land, upon which

the loganberries are to be raised, is uncertain, indefinite and insufficient. That part of the contract bearing upon this question is as follows: "The association agrees to buy and the grower agrees to sell and deliver to the association all of the agricultural or horticultural products of the varieties specified below, grown by or for him, or acquired by or for him at any place in Oregon during the years 1920, 1921, 1922, 1923, 1924, that he intends to sell or market or consign or deliver directly or indirectly for sale or marketing or consignment to any person or corporation whatsoever." "As specified below," a notation to the contract recites: "Grower's present acreage in Oregon of products subject to this contract, 15 acres of Logans. B. located at Salem; 4 acres of Logans. N. B. located at Salem."

It appears from the testimony that at the time the contract was entered into, August Lentz was the owner of and cultivating forty acres of land about six miles east of the city of Salem and had upon said land fifteen acres of bearing loganberry vines and four acres of nonbearing loganberry vines, and that he contracted in respect to this particular nineteen acres of land. It was not necessary that the description contained in the contract itself should describe the nineteen acres of land with such accuracy that it could be identified by the language of the contract alone. It was sufficient to so describe it that the nineteen acres referred to could be identified by extrinsic proof. The description of a tract of land in a deed or contract is certain if it can be made certain by any competent proof: *Raymond* v. *Coffey*, 5 Or. 132; *Boehreinger* v. *Creighton*, 10 Or. 42; *House* v. *Jackson*, 24 Or. 89 (32 Pac. 1027); *Hayden* v. *Brown*,

33 Or. 221 (52 Pac. 490); *Bogard* v. *Barhan,* 52 Or. 121 (96 Pac. 673, 132 Am. St. Rep. 676).

10. The defendant contends that the contract itself is an unlawful contract in that it is a contract for a combination or conspiracy in restraint of trade, and that its enforcement would create a monopoly. On its face the contract is legal. The presumption is that all contracts are legal and not illegal. As the contract was legal on its face, if the defendant, when sued for a breach of it, had desired to attack its legality, he should have both alleged and proved its illegality, and in his proof he should have shown how and why it was unlawful: *City Ice Co.* v. *Easton Merchants' Ice Co.,* 267 Pa. 500 (110 Atl. 350). Although the defendant, in order to raise this question, was required to do both of these things, he has done neither. Here we have a valid contract, the making of which was specially authorized by statute and the remedy at law for its enforcement was inadequate. The obligation of the contract was not that the defendant should grow loganberries upon his land, nor that he should sell the same, when grown, to the plaintiff, but that if he did grow loganberries and did sell them, then he was obligated to sell them to the plaintiff and to no one else.

11. The contract, therefore, could not be enforced by requiring the defendant to raise loganberries, nor by requiring the defendant to sell the loganberries to the plaintiff if defendant had no intention to sell them. This follows because there was no obligation imposed upon him by his contract to do either of these two things. He probably could not be compelled, by a suit for specific performance, to grow the loganberries, even if he had obligated himself to do so, because, in the language of Justice Harlan: "It

would be an invasion of one's natural liberty to compel him to work for or to remain in the personal service of another. One who is placed under such constraint is in a condition of involuntary servitude, —a condition which the supreme law of the land declares shall not exist * * ." *Arthur* v. *Oakes,* 63 Fed. 310 (25 L. R. A. 414, 11 C. C. A. 209). However, "the objection that to specifically perform the contract personal services are required will not divest the court of its powers to preserve the benefits of the contract. Defendant may be restrained from selling the crop to others, and, if necessary, a receiver can be appointed to harvest the crop." *Curtice Bros. Co.* v. *Catts,* 72 N. J. Eq. 831 (66 Atl. 935).

12. This contract, however, could be and was properly enforced by the mandatory injunction of the Circuit Court which enjoined the defendant from selling any of the loganberries contracted for to anyone except the plaintiff. The defendant was thus indirectly or negatively required to perform the obligation of his contract, which, in express terms, binds him to sell and deliver to the plaintiff all of the loganberries, grown by or for him upon the nineteen acres of land, which he intends to sell or market up to January 1, 1925. This relief can be enjoyed by the plaintiff only so long as the plaintiff itself performs all of the acts which by the contract, it has agreed to do. The case falls within the rule that "where a person is ordered by injunction to perform a negative covenant of that kind, the whole benefit of the injunction is conditioned upon the plaintiff performing his part of the agreement, and the moment he fails to do any of the acts which he engaged to do and which were the consideration for the negative covenant, the injunction would be dissolved." *Stocker*

v. *Wedderburn*, 3 K. & J. 393, 404. See, also, *Semidey* v. *Central Aguirre Co.*, 239 Fed. 610 (152 C. C. A. 444). Should the plaintiff itself fail to substantially perform the contract according to its terms, the defendant will thereupon be released from his agreement and upon proper application to the court below the injunction will be dissolved.

13. It appears from the testimony that during the years 1920 and 1921, August Lentz sold and delivered to the plaintiff, in conformity to his contract, all loganberries raised upon the nineteen acres of land, and that he was paid in full for the 1920 crop; but that in 1920 the plaintiff sold loganberries to the Rupert Canning Company, which, becoming insolvent, caused a $30,000 loss to the plaintiff; that the plaintiff allocated the entire loss to its loganberry growing members only, and charged against the account of August Lentz some $2,400, a large part of which was deducted from the amounts paid him for loganberries grown and delivered in 1921; that on account thereof Lentz became dissatisfied and until enjoined in this suit, made no delivery under his contract during the year 1922; that on or about January 1, 1922, Lentz, being in poor health, leased his premises to his son, Benjamin Lentz, for the period of one year, under an agreement that the son should cultivate the place, sell the products, pay all expenses and divide the profits equally with his father. The son at the time was just eighteen years of age, and except when temporarily away at school, had always lived at home with his parents and had worked upon the place and had notice of the terms of his father's contract with the plaintiff. No issue was raised in the answer as to plaintiff's nonperformance of the contract through its alleged failure to pay to August Lentz the amount

so allocated and charged against his account, but the answer does allege the facts with respect to the making of the lease and the raising of the loganberries and disposal thereof by the son.

14. The Circuit Court, before whom the case was tried, held that the transaction of leasing the place was not sufficient to relieve the defendants from their obligation to deliver the berries to the plaintiff during the year 1922, in accordance with the terms of the contract. This finding we affirm. There was no issue upon the other question and no attempt was made to amend the answer. If the defendant had desired to question the power of the plaintiff to allocate this sum, or any part thereof, against himself, or its legality in so doing, the answer should have raised an issue upon that question. As no issue upon that question was presented by the pleadings, the question was not before the court for its determination and the evidence in respect thereof is immaterial and irrelevant.

15. Plaintiff contends that if this question had been presented by the pleadings, the contract being severable, transactions had under it during any one year should have no bearing upon the rights of the parties arising from transactions occurring the subsequent year. We do not agree with this contention. Certainly if the plaintiff receives defendant's produce and fails to pay for such produce, the defendant should be released from any further performance upon his part.

16. Plaintiff, having also appealed from said decree, contends that the court erred in limiting the effect of the injunction to the nineteen acres of land mentioned in the contract, and in not including all loganberries that may be grown by or for August

Lentz or that may be acquired by him at any place within the state before January 1, 1925, which hereafter he may intend to sell, market, consign or deliver directly or indirectly.

Plaintiff also complains because the trial court failed to give judgment for an amount sufficient to include the traveling expenses incurred by the plaintiff, according to the provisions contained in the agreement, that in the event of a breach by the defendant, the defendant should pay all such expenses.

17. Assuming, without deciding, that the contract contemplates the delivery by the defendant August Lentz of the loganberries grown upon ground other than the nineteen acres mentioned in the contract, and that under the terms of the contract that the sale or delivery of loganberries grown upon ground other than the nineteen acres to anyone other than the plaintiff, would be a breach of the contract, yet the contract in that respect had not been breached by the defendant, and we think that the defendant should not be enjoined with respect to said loganberries until an actual breach of the contract occurs or is threatened. As to the question of traveling expenses, although the contract, by its express terms, stipulates what relief shall be afforded to the plaintiff upon a breach thereof by the defendant August Lentz, the court is not bound to afford such relief, unless, under the particular circumstances of the case presented for determination, the granting of such relief would be in accordance with the well established principles and rules of equity. For these reasons we think that the decree of the Circuit Court should not be disturbed upon either of the grounds raised by the plaintiff.

As the contract in question is not oppressive, unjust or illegal, and its enforcement by mandatory injunction restraining the defendant from selling the products contracted for, to anyone except the plaintiff, will work no injustice or hardship upon the defendant, and as plaintiff is clearly entitled to the relief granted, the decree of the Circuit Court is affirmed.

AFFIRMED.   REHEARING   DENIED.   COSTS   DISALLOWED   EITHER   PARTY.