Argued June 9, affirmed September 7, 1960

KUHNS ET UX *v.* STATE TAX COMMISSION

355 P. 2d 249

*Carlisle B. Roberts,* Assistant Attorney General, Salem, argued the cause for appellants. With him on the briefs were Robert Y. Thornton, Attorney General, and Curtis A. Levin, Assistant Attorney General, Salem.

*Robert M. Kerr,* Portland, argued the cause for respondent. With him on the brief were Tooze, Kerr & Tooze, Portland.

Before McALLISTER, Chief Justice, and ROSSMAN,

WARNER, PERRY, SLOAN, O'CONNELL and GOODWIN, Justices.

GOODWIN, J.

This is an appeal by the Commissioners of the Oregon State Tax Commission from a decree in the circuit court which ordered a refund of certain income taxes and penalties sought by the taxpayers, James and Faith Kuhns, under ORS 314.460.

The parties will be referred to as the Commission and Kuhns. In 1952 and 1953 Kuhns was a member of the Weston Grain Growers, Inc., an agricultural cooperative association organized under ORS ch 62, which governs the organization and operation of cooperatives as business organizations. In addition to being a member of the cooperative, Kuhns was also a patron whose transactions with the cooperative entitled him to patronage benefits.

As the result of his transactions with the cooperative in 1952 and again in 1953, Kuhns was credited on the cooperative's books with certain patronage dividends, evidence of which was received by him in each of the years in the form of a certificate, one of which, omitting the heading, was as follows:

"This is to Certify that James E. Kuhns is the owner of Capital Reserve Certificate No. 39, Series Q, and in the amount of $175.33, representing his patronage earnings in the Weston Grain Growers, Inc., an Oregon Corporation, for the fiscal year ending April 30, 1952.

"This Certificate is non-interest bearing except at option of Board of Directors of the Weston Grain Growers, Inc., and is redeemable at par at the option of said Board of Directors at the time and in the manner as provided in the Articles of

Association and By-Laws of said Cooperative Association.

"Capital Reserve Certificates shall be issued in serial number and shall be redeemed in numerical order and according to series. At the time of redemption, if a patron is indebted to the Association, the Board of Directors may thereafter order such patron's account credited with any dividends or refunds until such indebtedness is fully paid.

"The ownership of a Capital Reserve Certificate shall not entitle the owner to vote in the affairs of the Association.

"This Capital Reserve Certificate shall not be transferred except on the books of the Weston Grain Growers, Inc., nor shall it be subject to pledge, hypothecation or used as collateral except at the sole option of the Board of Directors of said Association, such consent to be in writing. * * * [Signature and seal omitted.]"

The Commission construed the receipt of the quoted certificate in November 1952 and its counterpart in November 1953 as the receipt of taxable income during each tax year in the amounts shown on the respective certificates, and assessed the income tax accordingly. Kuhns paid the tax and sued for a refund as provided by ORS 314.460, supra (formerly ORS 316.665; § 110-610, OCLA).

The Commission contends that the circuit court erred in granting the refund, saying that the receipt of the certificates during the tax year was equivalent to the receipt of income in an amount equal to that shown on each certificate. To support its contention, the Commission relies upon its interpretation of Oregon statutes and decisions from other courts.

ORS 316.160 authorizes the Commission to compute net income by a method which in its opinion clearly reflects income. Pursuant to this statute, the

Commission had promulgated the following income tax regulation:

"Reg. 6.160 (1)-(C) * * * * *

*"Patronage Dividends of Cooperatives.* The patron of a farmers' or fruitgrowers' cooperative marketing and purchasing association shall include in gross income not only sums received in cash from such association but also the face amount of all statements or certificates evidencing earnings, savings, or rebates based upon the amount or value of goods furnished to the cooperative by such patron or purchased by him from a cooperative, regardless of the method of accounting theretofore followed by such patron. "* * * * *." (Formerly Art. 607-1-c, 1951.)

The definition of gross income found in ORS 316.105 (formerly in § 110-1603, OCLA) would cover patronage dividends when received in cash or merchandise, and there is therefore no question in this case that the credits evidenced by the certificates would, if distributed, constitute gross income. The crucial question is "when?" The Commission says the income is taxable when entered on the cooperative's books and evidence thereof is received by the taxpayer. Kuhns says the income is taxable during the year in which he receives something he can spend. The trial court agreed with Kuhns.

To determine the effect of the patronage certificate, we must look to the by-laws of the cooperative. The certificate itself refers to the by-laws and to the articles of association. Without setting forth these documents in full, the following significant facts appear:

(1) The articles of association specifically authorize the directors "to set apart out of the funds of the association available for dividends a reserve or reserves for any proper purpose and to abolish such

reserves; and to authorize and cause to be executed mortgages and liens upon the property and franchises of this association."

(2) The by-laws provide in detail for the creation of both capital reserves and contingency reserves out of net receipts of the association and for the maintenance of such reserves in the sole discretion of the directors.

(3) Certificates of patronage dividends are made subordinate to the rights of present and future creditors of the association.

(4) Retirement of certificates shall be in the sole discretion of the directors.

(5) Every patron authorizes the association to apply any funds distributable to patrons first to the debt, if any, of such patron to the association, but only after such funds have been declared to be available for distribution.

It is seen from the above provisions of the articles and by-laws that the holder of a patronage dividend certificate receives evidence of a debt owed by the association to the patron under several limiting contingencies.

Nowhere in the articles of association or in the by-laws may be found a word that gives the holder of a certificate the right to exercise any dominion and control over what the Tax Commission says is "his" money.

He can not pledge the certificate as collateral.

He can not sell it.

He can not even apply it to his seed or fertilizer bill with the association until after the directors, at some time in the future which may never come to pass, declare that the certificate is "distributable."

Creditors, secured and unsecured, may precede the patron in any future year, and in a bad year they could seriously reduce or wipe out the reserves held by the association.

Notwithstanding the facts which caused the circuit court to hold that the patronage dividend was not income until the taxpayer could spend it, the Commission urges a number of theories to support its view.

First, the Commission says that the patron made an anticipatory assignment of income. Having been earned, the Commission contends, the income became vested in the taxpayer long enough for an anticipatory assignment created by the association's by-laws to operate and long enough for tax consequences to result.

This theory ignores the practical realities of the transactions which gave rise to the patronage dividend. We have only the pleadings before us, as the case was decided upon a demurrer. However, the usual method of doing business by the association is revealed in the exhibits attached to the complaint.

Kuhns had three choices when he harvested his wheat. He could sell it on the open market, or he could keep it, or he could sell it to the cooperative. When Kuhns took his wheat to the cooperative, presumably he obtained the market price for the wheat. The record does not show the details of the sale or whether title to the wheat passed to the cooperative. But this fact is immaterial, as the articles of association clearly provide for both purchase and sale with all the legal consequences thereof. The cooperative thereafter sold the wheat at what later turned out to be a profit. The cooperative presumably put the money in its bank, and used it in its sole discretion. Later, when the wheat accounts had been reckoned,

the cooperative advised Kuhns that he had a share of the association's reserve equal to $175.33 (for the year 1952), payable to him at some future time, if all went well and if the directors should decide to make distribution.

In the meantime, Kuhns received nothing which he could show as an asset on any financial statement. The dividend could draw no interest. Kuhns could not even set off the $175.33 against his accounts payable to the cooperative, if any. He was financially in the same position with reference to his 1952 crop as if he had sold his wheat for cash to a stranger.

It is quite true that Kuhns could carry in his pocket the evidence of a contingent asset, which would be worth as much to him as any other unsecured promissory obligation to be paid at the sole discretion of the maker. But we find no authority holding that contingent assets of this character are income.

■ The theory of a continuing anticipatory assignment of future income, if logically pursued, would also entitle the taxpayer to take a tax loss in any year that the association dipped into its reserves because its operating expenses exceeded any profit made on the resale of wheat. The Commission does not contend that there can be anticipatory benefits from losses. We are not dealing with a partnership, but with a distinctly separate creature of the law. Cooperative associations are neither partnerships nor ordinary business corporations, and the Legislative Assembly has recognized their distinct character by enacting a special chapter of the Code to deal with them. ORS ch 62.

There is no need to indulge in the legal fiction of an anticipatory assignment, because in reality Kuhns had nothing to assign. He merely sold his wheat.

Having sold to a cooperative, a legal relationship peculiar to such organizations came into being. The nature of the relationship was primarily that of seller (Kuhns) and purchaser (the association), with other rights and duties spelled out by the articles of association, the by-laws, and relevant statutes.

The Commission contends that some kind of agency relation between the patron and the association is created by the nature of their transactions. The Commission contends that the association was the agent of the patron for the purpose of receiving the patron's income and holding it for future distribution, citing *Oregon Growers' etc. Assn. v. Lentz,* 107 Or 561, 580, 212 P 811. In the *Lentz case,* the contract between the grower and the cooperative required the Association to pay all proceeds, less a stipulated reserve to the grower. The grower had a written agreement which spelled out in detail the duties each party owed the other.

■ In the instant case, the association had a general duty to account, but there was no limitation upon its stewardship. It had unlimited discretion in the creation and maintenance of reserves. There can be no agency relationship unless the purported principal has some control over his purported agent. A business organization which operates in its sole and unlimited discretion is not an agent but a principal. ALI Restatement 2d, Agency §§ 1, 14.

Taking up the numerous cases cited by the parties, we first dispose of the "assignment of income cases" cited by the Commission, and with which this court is in agreement. Typical cases are noted in Annotation, 131 ALR 661. Such cases as *Harrison v. Schaffner,* 312 US 579, 61 S Ct 759, 85 L ed 1055; *Lucas v. Earl,* 281 US 111, 50 S Ct 241, 74 L ed 731; *Helvering*

*v. Horst,* 311 US 112, 61 S Ct 144, 85 L ed 75, 131 ALR 655; and *Helvering v. Eubank,* 311 US 122, 61 S Ct 149, 85 L ed 81, merely hold that one who can exercise dominion and control over income and does so by assigning it to a third person may not thereby avoid tax, e.g., where a high-bracket father assigns bond coupons to a low-bracket son, who harvests the income. These cases are not questioned by the taxpayer in the case before this court, nor are they in point here.

Another line of cases relied upon by the Commission in support of its theory of anticipatory assignment is equally unavailing. These cases might be called the automobile-dealer-reserve-agreement cases, in which lending agencies carrying recourse automobile paper turn over part of the proceeds of an automobile sale to the dealer and retain part in a dealer's reserve. The leading case in this field is *Commissioner v. Hansen,* 360 US 446, 79 S Ct 1270, 3 L ed 2d 1360. There the court held that an accrual-basis dealer must include all of the proceeds of each sale in his computation of income. He could exercise enough dominion and control over the drawing down of the reserve under the terms of the financing agreement to constitute the reserve taxable income to him. The cases are clearly distinguishable on their facts from those of the instant case where the taxpayer could exercise no control.

■ Counsel have also cited authorities which hold that a dividend certificate which has a mrket value would constitute income during the year of its receipt by the taxpayer. This question is not before the court. The complaint below alleged that the certificates had no market value. The demurrer of the Commission admitted that allegation.

Still another line of federal cases relied upon by the Commission have not been followed by the federal tax authorities since the decision of *Long Poultry Farms v. Commissioner of Internal Rev.*, 249 F2d 726 (4th Cir. 1957). The federal Internal Revenue Service for many years had taken the same position as that taken in the instant case by the State Tax Commission. *Long Poultry Farms,* however, together with decisions of other circuit courts of appeal cited therein, caused the federal tax authorities to issue new regulations which harmonize with the view of the trial court in the instant case. Int. Rev. Bull. 1958-8, p 38, Feb. 24, 1958.

Now, for federal income-tax purposes, patronage dividend credits against which the patron cannot draw, or which he may not otherwise use without an act of distribution by the directors, are no longer includable in gross income until the year in which the funds are payable. The Oregon State Tax Commission recognizes that the federal rule is now different from that urged for the taxpayers of Oregon with reference to their state income tax. The Commission says, however, that the federal decisions are not binding upon the State of Oregon.

■ While it is true that the federal decisions are not binding on the State of Oregon with reference to local taxes, such decisions are entitled to be considered for whatever instructive value they may have in a particular case. In *Long Poultry Farms v. Commissioner of Internal Rev.,* supra, the federal court had practically the identical problem before it that we have in this case. The reasoning of that court, and the common sense analysis of the facts, commend the case to us. The Fourth Circuit Court of Appeals said:

"On these facts, as to which there is no dis-

pute, we think it clear that taxpayer did not receive income as the result of the credit allotted, nor did it become entitled to receive anything which could properly be accrued as income. All that it received was a conditional credit on the books of the cooperative, a credit which was subject to diminution if the cooperative sustained losses, was subordinated to the payment of the cooperative's debts, was not to be paid until all prior holders of credits over a nine year period had been paid in full and was to be paid only if and when the directors of the cooperative should so decide. It is argued that under implied agreement arising out of the provisions of the bylaws taxpayer in effect received in cash the amount of the credit and reinvested it in the revolving fund of the cooperative; but this is simply to exalt fiction and ignore reality. As said by this Court in Home Furniture Co. v. Com'r, 4 Cir., 168 F.2d 312, 313, 'Economic realities, not legal formalities, determine tax consequences.' The truth is that the taxpayer never received anything except a credit on the cooperative's books which did not entitle it to receive anything except upon the conditions above enumerated, and only then if the directors of the cooperative should so determine * * *." 249 F2d at 728.

■ The language of the Fifth Circuit Court of Appeals in *Commissioner of Internal Revenue v. Carpenter*, 219 F2d 635, 636 (1955), is equally instructive:

"* * * The respondent could control neither the amount of the funds that he would ultimately receive nor the time at which he might receive them. These matters were left to the discretion of the cooperative's directors, and even the directors could not pay off the certificates without written consent of the mortgagee. Therefore, the respondent never actually or constructively received or had any right to receive anything but the certificates * * *."

We adopt the rule adopted by the highest federal courts which have considered the same question, not because this is the federal rule, but because it makes sense.

A final argument is made by the Commission in this case that to permit the taxpayer to postpone reporting the income until he receives the actual cash permits an escape of taxable income which is made possible by the nature of an Oregon cooperative association. Under ORS 317.080 (9) agricultural cooperative associations are exempt from the corporate excise tax if they meet certain prescribed conditions. The theory behind the exemption from corporate excise tax is that the state will receive its taxes when the patrons receive their income, hence there is no need to tax the organization. In this respect the exempt cooperative association enjoys an advantage not shared by other corporations, but which is similar to that available in the partnership method of doing business. This was a choice which the legislature saw fit to exercise. The cooperative is a distinct entity and its tax status is its own. The Commission seeks to impose liability on the patron because there was a profit and hence a taxable event. As far as the patron is concerned, the taxable event occurs when he receives income.

The Commission says that some tax revenue may escape by reason of future losses by the association reducing past earnings, or by a taxpayer receiving distribution of his patronage dividends in a year when his tax bracket is lower than it would have been if the income had been taxable during the year when it was entered on the association's books. The argument begs the question. The real question is whether

the taxpayer can manipulate such a result. The answer is no; the matter is entirely out of his control.

■ While it is true that some income may escape taxation altogether and that other income may eventually be taxed at a lower rate, it is equally possible that some income may be taxed at a higher rate. It is proper for taxpayers to minimize their taxes in every legal way. The fact that a taxpayer does business with a tax-exempt cooperative does not render him liable for taxes on profits over which he can exercise no control, until such time as the income becomes such to the taxpayer. If the Commission considers that there is a potential escape of taxation, and deems it a matter of concern, then that is a matter for legislative consideration. It is no answer for the Commission, by its own action, to designate something as income when it is not income. The power to substitute its own accounting method for that of the taxpayer does not extend to a power to call something income during a year when it is not income by any accounting method.

Affirmed. Costs to the respondent.