**FROST v. CORPORATION COMMISSION OF OKLAHOMA et al.**

District Court, W. D. Oklahoma. Nov. 13, 1927.

No. 793.

1. Agriculture ⊂⇒1—Constitutional law ⊂⇒240 (1)—State law, authorizing co-operative cotton gins without adjudication of necessity required for commercial gins, held not unconstitutional, as denying equal protection of law (Comp. St. Okl. 1921, § 3714, as amended by Laws 1925, c. 109; §§ 3713, 3715, 3717; Const. U. S. Amend. 14).

Comp. St. Okl. 1921, § 3714, as amended by Laws 1925, c. 109, authorizing corporation commission to issue license for cotton gin on petition by 100 citizens and taxpayers of community for establishment of a gin to be run co-operatively, *held* not violative of Const. U. S. Amend. 14, guaranteeing equal protection of the law, since a gin to be operated co-operatively is different from ordinary commercial gin, for which an adjudication of necessity is required, pursuant to sections 3713, 3715, and 3717.

**2. Constitutional law ⬀48—Reasonable construction rendering statute valid will be adopted, rather than construction making it invalid.**

In case there are two constructions of a statute, equally reasonable, which may be reached, one rendering statute violative of Constitution and the other valid, that one should be adopted which will permit it to stand; presumption being that Legislature intended that which was permissible and valid.

**3. Public service commissions ⬀32—Action may be instituted in any court having jurisdiction to annul order entered by Oklahoma Supreme Court on review of decision by Corporation Commission (Comp. St. Okl. 1921, § 3716).**

Corporation Commission of Oklahoma, in the performance of its functions, exercises judicial, executive, and legislative powers, and Supreme Court on appeal, under Comp. St. Okl. 1921, § 3716, sits in the same capacity, authorizing an action by aggrieved party after such review in any court having jurisdiction to annul such order as may finally be entered by Supreme Court.

**4. Evidence ⬀5(2)—Judicial knowledge will be taken of conditions affecting country's agricultural interests.**

Courts will take judicial knowledge of conditions affecting the agricultural interests of the country.

In Equity. Suit by W. A. Frost, doing business under the name of the Mitchell Gin Company, against the Corporation Commission of the State of Oklahoma and others. Decree of dismissal.

Rainey, Flynn, Green & Anderson, of Oklahoma City, Okl., for complainant.

E. S. Ratliff, of Oklahoma City, Okl., for Corporation Commission.

Geo. F. Short, Atty. Gen., for defendants.

Before VAN VALKENBURGH, Circuit Judge, and COTTERAL and WILLIAMS, District Judges.

WILLIAMS, District Judge. In the bill filed by complainant in this court on April 14, 1926, it is alleged that he is, and was at all times hereinafter mentioned, engaged in and duly authorized to engage in the operation of a cotton gin in the city of Durant, Okl., under a license duly and regularly issued by the Corporation Commission of the state of Oklahoma under and by virtue of article 4 of chapter 20, Compiled Statutes of Oklahoma of 1921, and by chapter 109 of the Session Laws of Oklahoma of 1925, and that the defendant Durant Cotton Gin Company is a domestic corporation organized under and pursuant to article 19 of chapter 34 of the Compiled Statutes of Oklahoma of 1921; that cotton gins are public utilities, and the operation of same for the purpose of ginning seed cotton is a public business, and that complainant is engaged in public business as such, its said cotton gin being a public utility, and that under and by virtue of section 3715 of said chapter and article the Corporation Commission is vested with the power and charged with the duty of regulating and controlling such cotton gins in all matters relating to the performance of such duties and the charges therefor, with power to fix rates, rules, charges, and regulations to be observed by complainant and all others operating gins in the state of Oklahoma, and that by virtue of section 3717 of said chapter and article said Corporation Commission is vested with the power to enforce its orders against any person, firm, company, or corporation maintaining or operating a gin or gins, by imposing fines against him or them for the violation of any of its said orders, and that under the provisions of section 3713 of said chapter and article no person or persons or corporations in the state of Oklahoma are permitted to maintain and operate a gin for the purpose of ginning cotton seed, without first having secured a license for such purpose from said Corporation Commission; that by virtue of section 3714 of said chapter and article, as amended by chapter 109 of the Session Laws of 1925, all persons and corporations are prohibited from constructing or installing, and the Corporation Commission is prohibited from licensing, any new gin plant until satisfactory showing shall have been made to the Corporation Commission, setting forth that such gin is a needed utility, and that the proposed corporation, company, firm, or individual is a competent and desirable corporation, company, firm, or individual to establish and operate said gin, as may appear in the discretion of said commission, and that said provision apply to all persons, firms, corporations, and classes of people with the exceptions hereinafter set forth; that section 3714, as amended by chapter 109 of the Session Laws of 1925, contains the following proviso:

"That on the presentation of a petition for the establishment of a gin to be run co-operatively, signed by one hundred citizens and taxpayers of the community where the gin is to be located, the Corporation Commission shall issue a license for said gin."

It is the contention of said complainant that said proviso violates the Fourteenth Amendment to the Constitution of the United States, and for that reason no license should be issued to the Durant Co-operative Gin Company for such purpose.

Said defendants in their joint answer allege that the allegations contained in plaintiff's bill are insufficient in law or equity to constitute a basis for the relief sought, and that the defendant Durant Co-operative Gin Company had filed its application with said Corporation Commission for the establishment of a gin to be run co-operatively at Durant, in Bryan county, Oklahoma, under and by virtue of the provisions of said proviso, and further deny that the provisions of said proviso are discriminatory, arbitrary, or in any way violative of or contrary to the due process clause or equal protection clause of the Fourteenth Amendment to the Constitution of the United States. They further allege that in the operation of the cotton gins now located in the city of Durant, engaged in ginning seed cotton as public utilities, the facts will show that for the year 1924-25, under the rate in effect at that time with the gins operating therein, the gins in which complainant is interested as owner or stockholder have made excessive profits upon said operation; that complainant herein, in addition to his ownership in what is known as the Mitchell Gin, is also an interested owner and stockholder in a co-operative gin of Durant, and that the facts and records available disclose that for the ginning season of 1924-25 the Mitchell gin enjoyed a net earning, over and above all operating expenses, taxes, and other charges, of 18 per cent., upon the book value thereof undepreciated; that what is known as the co-operative gin, ——— per cent. of the stock of which is owned by plaintiff, for the ginning season of 1924-25, enjoyed a net earning on the book value undepreciated of 153.6 per cent., after allowing all operating expenses, including taxes, and that the two gins for the same year enjoyed an average net earning, after deducting all operating expenses, of 85.8 per cent.; that the cotton production industry, including the gathering, picking, ginning, and storing and marketing thereof, is a leading agricultural pursuit in so far as values are concerned within the state of Oklahoma; that the ginning, marketing, and processing of said product is one that is subject to continual abuse, in that a large proportion of the gins in the state of Oklahoma have been constructed and are operated by those persons who are also interested in the purchase of cotton seed extracted from the cotton, as well as in the purchase of the staple after it is ginned and processed for marketing; that such concerns as are engaged in the cotton seed business, as well as the cotton buying

business, and also operating gins in connection therewith have an advantage amounting to a virtual monopoly of such products within the state of Oklahoma; that the state of Oklahoma, through legislative enactments throughout the past, has by the adoption of legislation designated to foster and encourage agriculture enacted statutes permitting all persons, as well as those engaged in agriculture and horticulture, to organize for the purpose of conducting agricultural, dairy, live stock, irrigation, horticultural, mercantile, manufacturing, mechanical, and industrial business upon a co-operative plan; that pursuant to said policy the Legislature of the state of Oklahoma has enacted two statutes, the first of which, enacted by the 1917 session of the Legislature of the state of Oklahoma and effective June 14, 1917, is found in article 16, chapter 34, Compiled Oklahoma Statutes 1921, and provides that co-operative agricultural or horticultural associations instituted for the purpose of mutual help, and not having capital and stock, and not conducted for profit, may be formed under provisions of said act by any number of persons, not less than five, to engage in agriculture and horticulture. It outlines the provisions which are to be incorporated in the articles of association, the powers of such associations, the admission of members into the association, the manner and way in which the business of such concern may be operated, all of which is for the mutual benefit and for the purpose of rendering services described in its articles of association to membership only, this act being for strictly and distinctly nonprofit, mutual, self-help organization, and clearly distinguishable in every material respect from the ordinary private corporation organized for profit.

The second statute, adopted by the session of the Legislature of 1919 and approved April 4, 1919 (Laws 1919, c. 147), provides that ten or more persons may form a corporation for the purpose of conducting an agricultural, dairy, live stock, irrigation, horticultural, mercantile, mining, manufacturing, mechanical, or industrial business upon a co-operative plan, and with their associates, successors, and assigns may become and be a body politic and corporate by complying with the provisions of this act, and this act, as amended by the Legislature of 1923, as shown by chapter 167, Session Laws 1923, authorizes ten or more persons who may so desire to incorporate co-operatively to engage in the enterprises and the businesses set forth in the first section thereof. The act provides in detail the requisites for ar-

ticles of incorporation, the way and manner in which said articles may be amended, the powers to be exercised by said corporations, the amount of stock to be held, and that no stock shall be sold at less than par value; that 20 per cent. of the par value of the stock subscribed for shall be paid in before the corporation commences business, and that no certificate of stock shall be issued to any person until the full amount of the subscription thereof shall have been paid; that no person shall become a shareholder, except by consent of the board of directors, and that not more than 5 per cent. of the stock outstanding at any time, and not more than $500 in par value, shall be held by or for one person, firm, or corporation; that each shareholder or subscriber shall only be entitled to one vote, and no more, irrespective of the number of shares owned; that, if the indebtedness at any time of the corporation shall exceed the amount of its subscribed capital stock and surplus, the directors assenting thereto shall be personally and individually liable for such excess to the creditors except for indebtedness created in favor of the state warehouse revolving fund, and section 5648 of said chapter provides for the apportionment in the handling of the profits and earnings of such associations from time to time not less than once in each year and imposing the following requirements:

"(1) Not less than 10 per cent. thereof accruing since the last apportionment shall be set aside in a surplus or reserve fund until such fund shall equal at least 50 per cent. of the paid-up capital stock.

"(2) Dividends at a rate not to exceed 8 per cent. per annum may, in the discretion of the directors, be declared upon the paid-up capital stock. Five per cent. may be set aside for educational purposes.

"(3) The remainder of such net earnings and profits shall be apportioned and paid to its members ratably upon the amounts of the products sold to the corporation by its members, and the amounts of the purchases of members from the corporation: Provided, that if the by-laws of the corporation shall so provide the directors may apportion such earnings and profits in part to nonmembers upon the amounts of their purchases and sales from or to the corporation."

It is further pleaded in said answer that, with respect to the classification made by the Legislature of the state of Oklahoma as to co-operative concerns engaged in the ginning of cotton as public utilities, a like distinction has been made by the Congress of the United States in various acts of legisla-

tion, the latest instance being in the federal Revenue Act of 1921, which, by section 231 (Comp. St. § 6336⅛o), expressly distinguishes and classifies such organizations and associations by exempting them from the payment of income taxes. It is further specifically pleaded in said answer that the defendant Durant Co-operative Gin Company is a co-operative corporation duly organized, a copy of the articles of incorporation being attached thereto as a part thereof and designated as Exhibit C. Said by-laws recite that said corporation is formed for the following purposes:

(a) To handle co-operatively and collectively the problems of ginning, grading, handling, processing, storing, shipping, warehousing, and marketing cotton and cotton products.

(b) To engage in any activity in connection with the ginning, grading, handling, processing, storing, shipping, warehousing, and marketing of cotton or cotton products and in the financing of any such operations.

It further provides that no person, firm, or corporation may at any time hold more than 5 per cent. nor more than $500 worth, par value, of said stock. And further: "The voting power of stockholders shall be one vote for each individual stockholder, irrespective of the amount of capital stock held by such stockholder." It is further alleged that said corporation is composed of 112 cotton growers, citizens, and taxpayers of Bryan county, Oklahoma, as shown by a certificate of the secretary thereof, under oath, attached hereto, made a part hereof, and marked Exhibit D, who have associated themselves for the purpose disclosed by said articles of incorporation, under the terms of said statute; that the petition submitted to the Corporation Commission as a basis for action by it in the granting of a license or permit to engage in co-operative ginning, which gave rise to this cause of action, is signed by the 112 stockholders, who are also citizens and taxpayers of Bryan county, Oklahoma, as is disclosed by a certificate from the county treasurer of Bryan county, Oklahoma, which certificate is attached hereto, made a part hereof, and marked Exhibit E. It is further averred that the Durant Co-operative Gin Company has provided by its by-laws for the apportionment of earnings and profits of said association to nonmembers who may patronize said corporation on the amount of gin patronage shown by the books of the corporation.

It is further averred that the citizens and taxpayers associating themselves to-

gether in the corporation aforesaid were authorized by the terms of the statute of the state of Oklahoma passed in 1917, and contained in chapter 16 of said article 34, in a nonprofit nonstock association for the purpose of rendering service to the members of said association solely, and said defendant Durant Co-operative Gin Company now alleges and avers that, in case it is found impracticable or illegal for it to organize under the terms of the 1919 statute that it will organize and operate as an association under the terms of the 1917 act as a nonprofit, purely co-operative and mutual association for the purpose of rendering service to its membership only, either of which organizations defendants allege and aver come within the amendment to the cotton ginning statute of 1925, providing for the licensing by the Corporation Commission of gins "to be run co-operatively."

Parties stipulate that complainant is engaged in the cotton ginning business under the name of Mitchell Gin Company, owning said gin in the city of Durant, Oklahoma, same being operated by virtue of a license issued by the Corporation Commission under and by virtue of article 4, chapter 20, Statutes 1921, as amended by chapter 191, Session Laws of Oklahoma 1923, and by chapter 109, Session Laws of Oklahoma 1925, and that Fred Capshaw, Frank Carter, and C. C. Childers are the duly elected, qualified, and acting members of the Corporation Commission of the state of Oklahoma, and that Edwin Dabney is the Attorney General of the state of Oklahoma, and that the amount in controversy, exclusive of interest and costs, exceeds the sum of $3,000; that the Durant Co-operative Gin Company in 1926 filed its application with the Corporation Commission for permission to establish a gin at Durant, Okl.; that complainant protested in writing against the issuance of a license or permit by the said commission to the said Durant Co-operative Gin Company; that the articles of incorporation of said Durant Co-operative Gin Company are as follows:

"First.   The name of this corporation shall be Durant Co-operative Gin Company.

"Second.   The purposes for which this corporation is formed are as follows:

"(a) To handle co-operatively and collectively the problems of ginning, grading, handling, processing, storing, shipping, warehousing and marketing cotton and cotton products.

"(b) To engage in any activity in connection with the ginning, grading, handling, processing, storing, shipping, warehousing and marketing of cotton or cotton products and in the financing of any such operations.

"(c) To purchase and sell any cotton, cotton seed, or cotton products, and to purchase and sell machinery equipment or supplies used in any of the above-mentioned activities by said corporation.

"(d) To borrow money; to indorse, guarantee the payment of, or secure in any way, commercial paper or negotiable instruments used or needed in the course of its activity as such corporation.

"(e) To sell, issue, discount, or borrow money upon any commercial paper or negotiable instruments, or promissory notes or warehouse receipts, or mortgages, or bonds, or any other kind of property or security owned by or under the control of said corporation.

"(f) To purchase, or otherwise acquire, and to hold, own, exercise all rights of ownership, sell, transfer, or pledge shares of the capital stock, or bonds, or securities of any corporation or association engaged in the ginning, grading, handling, processing, shipping, warehousing or marketing of cotton or cotton products.

"(g) To buy, own, lease, contract for the use of, and exercise all privileges of ownership over such real or personal property as may be necessary or convenient for the conduct and operation of any of the business of said corporation.

"(h) To acquire, own, or develop any interest in patents, trade-marks, or copyrights deemed necessary in the proper conduct of the business of the corporation.

"(i) To do each and everything, necessary, suitable, or proper in the judgment of the directors of said corporation, anywhere throughout the world, for the accomplishment of any of the purposes or attainment of any one or more of the objects herein enumerated or which shall at any time appear conducive to or expedient for the interest or benefits of this corporation and pursuant thereto, to enter into any and all contracts deemed necessary by the board of directors for the furtherance of any of the purposes for which this corporation is formed.

"Third.   The principal place of business of this corporation shall be at Durant, in the county of Bryan, state of Oklahoma.

"Fourth.   The term for which this corporation shall exist shall be twenty (20) years.

"Fifth.   The capital stock of this corporation shall be $40,000, divided into 4,000 shares, of $10 each.

"Sixth.   No person, firm, or corporation

may at any time hold more than 5 per cent. nor more than five hundred ($500.00) dollars worth, par value, of said stock.

"Seventh. There shall be five (5) directors of this corporation, and the following named shareholders shall constitute a board of directors until the first annual meeting of the stockholders and until their successors are elected and qualified: C. E. Thornley, President, of Durant, R. 3, Okl., shares, 10; G. C. Jones, Vice President, of Durant, R. 1, Okl., shares, 10; E. O. White, Secretary-treasurer, of Durant, R. 3, Okl., shares, 10; P. H. Harville, of Durant, R. 2, Okl., shares 5; Mart Love, of Calera, shares, 10.

"Eighth. The voting power of stockholders shall be one vote for each individual stockholder, irrespective of the amount of capital stock held by such stockholder."

[1] The sole objection made before the State Corporation Commission to the issuance of the license or permit was on the ground that the act under which it was sought was unconstitutional, as violating the federal Constitution, and that is the only ground upon which a writ of injunction is here sought. On the presentation of a petition for the establishment of a gin *to be run co-operatively,* signed by 100 citizens and taxpayers of the community in which the gin is to be located, the said commission is to issue a license. Prior to enactment of the act of 1917 gins were operated by an individual, copartnership, or a corporation, no permit or license of any character being required. Since passage of act of 1917 a gin may be owned and operated by an individual, copartnership, or a corporation when necessity therefor is found by the Corporation Commission. Act of 1925 continues such practice, except as provided in said proviso; it having effect of classifying the gin business, and such gins as come within the class referred to in said proviso may operate without the necessity therefor being found and determined by the Corporation Commission. That the gin is "to be run co-operatively" and vouched for by a petition signed" by 100 citizens and taxpayers in the community where the gin is to be located," is all that is required. The Legislature of the state has enacted two separate statutes authorizing the organization of co-operative concerns. Article 16, chapter 34, Compiled Oklahoma Statutes 1921, relates to agricultural and horticultural associations. Section 5599 thereof provides:

"Co-operative agricultural or horticultural associations, instituted for the purposes of mutual help, and not having capital stock

or conducted for profit, may be formed, under the provisions of this act, by any number of persons, not less than five, engaged in agriculture or horticulture."

Said act, as amended by chapter 181, p. 309, Session Laws 1923, provides as follows:

"Any number of persons, not less than five, engaged in the production of agricultural or horticultural products, may act together and organize co-operative associations, not having capital stock and not conducted for profit, for mutual help in collectively processing, preparing for market, picking, storing, shipping, handling, and marketing such products of persons so engaged; and the manufacturing or the making of the by-products thereof; or in the financing of any of the above activities; and may have marketing agencies in common with other like or similar associations; and such associations and their members may make all necessary contracts and agreements to effect such purposes; and such association may make advances to members, and such members may hire, rent or buy their farm supplies and machinery from or through the association: Provided, that such association shall be operated for the mutual benefit of the members thereof, only as such producers; and no member of the association shall have more than one vote because of the membership capital he may own therein; and such associations shall not pay dividends on membership capital in excess of eight per centum per annum. And co-operative associations, not having capital stock, now existing in Oklahoma, exercising, or attempting to exercise, corporate rights and powers, or to perform duties as a corporation, for the purpose or any of the purposes aforesaid, are hereby validated, and are granted all of the rights and powers, and subjected to all of the restrictions and limitations, of this act, as herein amended; and are granted for the enforcement of existing as well as subsequent contracts, all of the rights and remedies herein provided."

Under this statute a co-operative gin may be organized by cotton growers and producers and operated for purpose of ginning seed cotton, preparing for market such cotton and seed, and the manufacturing of by-products thereof. A gin "to be operated co-operatively" is a classification different from the ordinary commercial gin for which an adjudication of necessity therefor is required. Such class acting in such a co-operative way in ginning and marketing their own agricultural products in preparing their own cotton and

26 F.(2d)—33

seed and products thereof for market is a reasonable classification and not violative of the Fourteenth Amendment.

[2] As to said proviso for the issuance of license for gins "to be operated co-operatively," if two constructions equally reasonable may be reached, one rendering the proviso violative of the Constitution and the other valid, that should be adopted which would permit it to stand; the presumption being that the Legislature intended that which was permissible and valid, and therefore, in using the term "to be operated co-operatively," intended that such gin should be organized and operated under the co-operative act as contained in article 16, chapter 34, Compiled Oklahoma Statutes Annotated 1921, and amendments thereto.

In American Sugar Refining Co. v. Louisiana, 179 U. S. 89, 21 S. Ct. 43, 45 L. Ed. 102, an act was involved providing for the licensing for the carrying on of business of refining sugar and molasses, the annual tax on such license to be based on the gross annual receipts of all persons, associations of persons, or business firms and corporations engaged in said business, with the proviso that said section shall not apply to planters and farmers grinding and refining their own sugar and molasses, and further providing that it shall not apply to those planters who granulate syrup for other planters during the rolling season. In the opinion it is said:

"The Constitution of Louisiana classifies the refiners of sugar for the purpose of taxation into those who refine the products of their own plantations, and those who engage in a general refining business, and refine sugars purchased by themselves or put in their hands by others for that purpose, imposing a tax only upon the latter class. To entitle a party to the exemption it must appear (1) that he is a farmer or a planter; (2) that he grinds the cane as well as refines the sugar and molasses; (3) that he refines his own sugar and molasses, meaning thereby the product of his own plantation. Whether he may also refine the sugar of others may be open to question, although by its express terms the act does not apply to planters who granulate syrup for other planters during the rolling season. The discrimination is obviously intended as an encouragement to agriculture, and does not deny to persons and corporations engaged in a general refining business the equal protection of the laws."

See, also, Citizens' Tel. Co. v. Fuller, 229 U. S. 327, 33 S. Ct. 833, 57 L. Ed. 1206.

In Fidelity Mutual Life Association v. Mettler, 185 U. S. 326, 22 S. Ct. 669, 46 L. Ed. 922, it is said:

"The ground for placing life and health insurance companies in a different class from fire, marine, and inland insurance companies is obvious, and we think that putting them in a different class from mutual benefit and relief associations doing business through lodges, and benevolent associations of the character mentioned in the Texas statutes, is not an arbitrary classification, but rests on sufficient reason. The Legislature evidently intended to distinguish between life and health insurance companies engaged in business for profit (and we are not called on to refine as to the distribution of such profits), and lodges and associations of a mutual benefit or benevolent character, having in mind also the necessity of the prompt payment of the insurance money in very many cases, in order to provide the means of living of which the beneficiaries had been deprived by the death of the insured."

In German Alliance Ins. Co. v. Lewis, 233 U. S. 389, 34 S. Ct. 612, 58 L. Ed. 1011, L. R. A. 1915C, 1189, it is said:

"The provision of the statute is, 'That nothing in this act shall affect farmers' mutual insurance companies organized and doing business under the laws of this state and insuring only farm property.' The distinction is, therefore, between co-operative insurance companies insuring a special kind of property and all other insurance companies. It is only with that distinction that we are now concerned. There are special provisions in the statutes of Kansas for the organization of co-operative companies and if the statute under review discriminates between them the German Alliance Company cannot avail itself of the discrimination. A citation of cases is not necessary, nor for the general principle that a discrimination is valid if not arbitrary, and arbitrary in the legislative sense; that is, outside of that wide discretion which a Legislature may exercise. A legislative classification may rest on narrow distinctions. Legislation is addressed to evils as they may appear, and even degrees of evil may determine its exercise. Ozan Lumber Co. v. Union County Nat. Bank, 207 U. S. 251 [202 U. S. 623, 26 S. Ct. 768, 50 L. Ed. 1176]. There are certainly differences between stock companies, such as complainant is, and the mutual companies described in the bill, and a recognition of the differences we cannot say is outside of the constitutional power of the legislature. Orient Ins. Co. v. Daggs, 172 U. S. 557 [19 S. Ct. 281, 43 L. Ed. 552]."

In the case of Dark Tobacco Growers' Co-op. Ass'n et al. v. Dunn, 150 Tenn. 614, 266 S. W. 308, it is said:

"We are impressed with the idea that co-operative marketing of farm products is an economic necessity. It was championed by all three parties in the recent national political contest. It has been enacted into law by the Congress of the United States (the Capper-Volstead Act, U. S. Comp. St. Ann. Supp. 1923, §§ 8716½, 8716½a [7 USCA §§ 291, 292]), and by the Legislatures in two-thirds of the states. The Legislature of Tennessee passed such an act in 1923 (chapter 100). The policy of the state, as expressed by the Legislature, is found in section 5 of said act, as follows: 'That every group of persons contemplating the organization of an association under this act is urged to communicate with the College of Agriculture, University of Tennessee, who will inform them whatever survey of the marketing conditions affecting the commodities proposed to be handled may indicate regarding probable success.'

"It is here recognized that agriculture is characterized by individual production in contrast to the group or factory system that characterizes other forms of industrial production; and that the ordinary form of corporate organization permits industrial groups to combine for the purpose of group production and the ensuing group marketing and that the public has an interest in permitting farmers to bring their industry to the high degree of efficiency and merchandising skill evidenced in the manufacturing industry; and that the public interest urgently needs to prevent the migration from the farm to the city in order to keep up farm production and to preserve the agricultural supply of the nation; and that the public interest demands that the farmer be encouraged to attain a superior and more direct system of marketing in the substitution of merchandising for the blind, unscientific, and speculative selling of crops; and that for this purpose, the farmers should secure special guidance and instructive data from the College of Agriculture, University of Tennessee.

"The validity of these acts has been sustained by every court passing upon them. Burley Tobacco Growers' Co-op. Ass'n v. Gardner, Ohio State (N. P.), decided February 24, 1924, but not yet published; Northern Wisconsin Pool v. Bekkedal (Wis. 1924) [182 Wis. 571] 197 N. W. 936; Dark Tobacco Growers' Ass'n v. Potter [Potter v. Dark Tobacco Growers' Co-op. Ass'n] (1925)

201 Ky. 441, 257 S. W. 35; Tobacco Growers' Co-op. Ass'n v. Jones (1923) 185 N. C. 265, 117 S. E. 174 [33 A. L. R. 231]; Brown v. Staple Cotton Ass'n (1923) 132 Miss. 859, 96 So. 849; Texas Farm Bureau Ass'n v. Stovall (1923) 113 Tex. 273, 253 S. W. 1101; Kansas Wheat Growers' Co-op Ass'n v. Schulte (1923) 113 Kan. 72 [672] 216 P. 311; Oregon Growers v. Lentz (1923) 107 Or. 561, 212 P. 811; Washington Cranberry Growers' Ass'n v. Moore (1922) 117 Wash. 430, 201 P. 773, 204 P. 811, 25 A. L. R. 1077; Citrus Fruit Ass'n v. Yeoman (1921) 51 Cal. App. 759, 197 P. 959; Ex parte Baldwin County Producers' Corporation (1919) 203 Ala. 345, 83 So. 69; Castorland Milk Co. v. Shantz (Sup. 1919) 179 N. Y. S. 131."

The encouragement of co-operative marketing on the part of the producers of agricultural products, which includes agriculture, horticulture, viticulture, dairy products, live stock, and the products thereof, the products of poultry and bee raising, the edible products of forestry, and any and all products raised or produced on farms, and possessed or manufactured products thereof, transported or intended to be transported in interstate or foreign commerce, appears to be a declared policy on the part of the United States. See section 451, c. 18, tit. 7, Code of Laws of the United States in force December 6, 1926, 44 United States Statutes at Large 69th Congress 1925–1926, pt. 1 (7 USCA § 451).

If said proviso under its terms or on its face be valid, though the Durant Co-operative Gin Company, acting under article 19, chapter 34, Compiled Oklahoma Statutes 1921, referred to as the act of 1919, the purpose of which, being set out in section 5637, as follows: "Ten or more persons may form a corporation for the purpose of conducting an agricultural, dairy, live stock, irrigation, horticultural, mercantile, manufacturing, mechanical or industrial business upon a co-operative plan, and, with their associates, successors and assigns may become and be a body politic and corporate by complying with the provisions of this act"—is seeking such permit, that would not render said proviso void, but only question as to error of administration or ruling by the Corporation Commission would be involved. If a question of violation of the Fourteenth Amendment to the federal Constitution should arise on account of erroneous application of the law by the State Corporation Commission in the issuance of a license or permit, claiming to act by virtue of said proviso, such error may be corrected by an appeal from the action

of the Corporation Commission to the Supreme Court of the state, which would sit in the same capacity on review as the state Corporation Commission in making the order appealed from.

In cases of Oklahoma Operating Co. v. Love et al., 252 U. S. 331, 40 S. Ct. 338, 64 L. Ed. 596, and Oklahoma Gin Co. v. State of Oklahoma, 252 U. S. 339, 40 S. Ct. 341, 64 L. Ed. 600, the action of the state Corporation Commission under a different statute was involved, to wit: Section 8235, Revised Laws Oklahoma 1910, and under the then existing procedure no right of appeal to the Supreme Court existed.

That under section 3716, Oklahoma Compiled Statutes 1921, such right of appeal now exists, was recognized by the Supreme Court of the state of Oklahoma in Re Farmers' Co-operative Gin Company of Bokchito (No. 17390) 122 Okl. 115, 251 P. 729, opinion filed December 21, 1926, from which I quote as follows:

"Appeal from Corporation Commission. Application of Farmers' Co-operative Gin Company of Bokchito, Okl., for license to operate a cotton gin at Bokchito. From an order of the State Corporation Commission, granting such license, B. E. Garrett, Joe T. Riddle, W. R. Abernathy, and A. W. Chestnut, doing business under the firm name and style of Farmers' Independent Gin Company of Bokchito, Okl., appeal. Affirmed. * * *

"Phelps, J. This cause comes here for review of the action of the Corporation Commission in granting the application of the Farmers' Co-operative Gin Company at Bokchito for a license to operate a cotton gin. The questions presented are identical with the questions presented in cause No. 17337, Choctaw Cotton Oil Co. et al. v. Corporation Commission (opinion filed June 1, 1926) 121 Okl. 55, 247 P. 390, except in that case an original action was filed in this court for a writ of prohibition to prohibit the Corporation Commission from issuing a license to the Farmers' Co-operative Gin Company to construct and operate a cotton gin at Kinta, Okl., and in this case the license was granted and an appeal from the order granting the license was taken.

"The questions involved in the two cases are identical, and the opinion and syllabus in that case are hereby adopted as the opinion and syllabus in this case, and upon the authority of that case the action of the Corporation Commission is affirmed."

See, also, sections 20 and 35, article 9, Const. Okl.

In Pioneer Telephone & Telegraph Co. v. State, 40 Okl. 425, 138 P. 1036, it is said:

"Three remedies were available to the appellant, by which the validity of said order might be challenged: (1) By appeal, as provided in section 20 of article 9 (section 238, Williams' Ann. Ed.) of the Constitution; (2) by application made directly to the commission to set aside order (section 18 of article 9 [section 234, Williams' Ann. Ed.] of the Constitution); and (3) by an action in equity to restrain its enforcement. As a matter of practice, the first two remedies should be sought before the last remedy is resorted to. Prentis v. Atlantic Coast Line, 211 U. S. 210, 29 S. Ct. 67, 53 L. Ed. 150."

In Atchison, T. & S. F. Ry. Co. v. State et al., 23 Okl. 522, 101 P. 266, it is said:

"This court, when reviewing an appeal from such an order, is not passing upon the question as to whether or not the order in effect confiscates the property of the appellant, or takes it without due process of law, except in a legislative capacity by virtue of section 22, art. 9, supra, in considering and determining the reasonableness and justness of the action of the commission appealed from, as well as any other matter arising under such appeal, supported by the prima facie presumption that such action of the commission shall be regarded as prima facie just, reasonable, and correct. However, should this court sit as a court judicially to determine whether or not a rate fixed by virtue of an act of the Legislature or of a commission created by law for such purpose should be set aside and annulled on the ground that it violates the constitutional rights of the carrier to that degree that it amounts to a taking of property without proper compensation, or without due process of law, a different rule would govern. In that case the judiciary in a judicial capacity would be sought to interfere to protect against a violation of the federal or state Constitution, and the rule in such a case would be that before the court would interfere it must clearly appear that the rate or act complained of was confiscatory. But in the exercise of its peculiar jurisdiction as a legislative body, in reviewing the action of the Corporation Commission, the duty of this court is marked out in the Constitution, and that is to determine whether or not such order appealed from was reasonable, just and correct, supported by the prima facie presumption in favor of the action of the commission that it is reasonable and just."

[3] The Corporation Commission, under the Constitution of Oklahoma, in the performance of its function exercises judicial, executive, and legislative powers, and, when an appeal is prosecuted from that body to the

Supreme Court to review a legislative or administrative matter, that court, in reviewing such appeal, sits in the same capacity as the Corporation Commission. When it has acted in such review, then the aggrieved party may institute an action in any court having jurisdiction to annul such order in said matter as may be finally entered by the Supreme Court sitting in such like capacity. See Pioneer Tel. & Tel. Co. v. State, 40 Okl. 417, 138 P. 1033.

As between a person, individual, firm, or corporation engaged in ginning seed cotton commercially for profit, and a co-operative organization under act of 1919 engaged in ginning of seed cotton, the following distinctions as to such corporations are noted:

Section 5301, Compiled Statutes 1921, provides: "Private corporations may be formed by the voluntary association of three or more persons upon complying with the provisions of this chapter, for the following purposes, namely: Mining, manufacturing, and other industrial pursuits. * * *" Section 5304 provides that the articles of incorporation for such corporation shall set out: First, name of the corporation; second, the purpose for which it is formed; third, place where its principal business is to be transacted; fourth, term for which it is to exist; fifth, number of directors; sixth, amount of capital stock and number of shares; and such corporation shall have the power to create two or more classes of stock with such designations, preferences, and voting powers, and restrictions or qualifications thereof as shall be stated in such articles: Provided, that the holder of no stock shall be prohibited from voting upon all questions pertaining to the increasing of capital stock or bonded indebtedness of the corporation. Any and all classes of preferred stock may, if desired, be made subject to redemption, etc. And the holder of any preferred stock shall be entitled to receive, and the corporation shall be bound to pay him, dividends at such rates and on such conditions and at such times as may be stated, and that, after the dividends on the preferred stock have been paid, then dividends may be paid on the common stock out of any remaining surplus. No amount of capital stock is required to be paid in before commencing business. See section 5316, Statutes 1921.

Corporations organized under the act of 1919 belong to a separate and distinct class from such ordinary private corporations; ten or more persons being required to associate themselves together to form such corporation, and not less than 20 per cent. of the value of the stock must be paid in before business is commenced, and no person may become a stockholder under the act of 1919, except by consent of the board of directors, and not more than 5 per cent. of the stock and not more than $500 of the paid-up stock can be owned by any one person, while in the ordinary private corporation all the stock may be owned by one person, except enough to qualify for board of directors, and under the act of 1919 the voting rights of the stockholders are restricted to one vote for each stockholder, regardless of the amount of stock or interest possessed by such stockholder. In the ordinary private corporations in the same business, the right to vote is determined by the amount of stock, one vote for each share of stock held by such stockholder.

Under act of 1919 (section 5647, article 19, Compiled Statutes 1921) it is provided: "If the indebtedness of such corporation shall at any time exceed the amount of its subscribed capital stock and surplus, the directors assenting thereto shall be personally and individually liable for such excess to the creditors." Under statutes relating to ordinary corporations no such liability is prescribed; the only liability of a stockholder is the amount of his stock. When stock is paid up, no further liability exists as to a stockholder, except in cases of fraud. When not paid up, he would be liable to pay in his subscribed capital stock to meet the indebtedness of the concern.

Section 5649 of the act of 1919 further provides: "If the directors of such corporation shall declare and pay any dividend or apportionment of earnings, or profits to members or nonmembers when the corporation is insolvent or when it would be rendered insolvent by such payment, such directors shall be jointly and severally liable for all debts of the corporation then existing and for all such debts as shall be thereafter incurred while they shall respectively continue in office. Any director may relieve himself from such liability at any time before the time fixed for the payment of such dividend or apportionment by filing a certificate in writing of his objection with the secretary of the corporation, and with the county clerk of the county in which the principal office is located."

Section 5650 further provides: "At the time of each dividend or apportionment of profits and at least once in every year, the directors shall cause to be prepared a statement showing the financial condition of the corporation at the end of the period to which

such dividend or apportionment relates, in such form as shall fully exhibit the assets and liabilities of the corporation; its earnings and profits, purchases and sales, expenses and outlays, for the period covered by such dividend or apportionment, in such manner that a good understanding of the condition of the company may be obtained from such statement, and shall cause such statement to be kept on file with the secretary where the same may be examined by any member of the corporation at all reasonable times." No dividend could be declared, except upon the paid-up capital stock, and then not in excess of 8 per cent. thereof, and 5 per cent. may be set aside for educational purposes. No member or person shall hold more than $500, or more than 5 per cent. of the outstanding stock. Section 5642, Statutes 1921.

Section 5648, paragraph 3, further provides: "The stock of such corporation shall not be sold at less than its par value. Twenty per cent. of the par value of the stock subscribed for shall be paid in before the corporation shall commence business, and the remainder of such subscriptions shall be paid from time to time upon call of the directors. No certificate of stock shall be issued to any person until the full amount of the subscription therefor shall have been paid. No person shall become a shareholder except by consent of the board of directors. Not more than five per cent. of the stock outstanding at any time, and not more than five hundred dollars in par value, shall be held by or for one person, firm or corporation."

What does "to be run co-operatively" mean? "Co-operative" is defined by Mr. Webster as "one who practices co-operation; a member of a co-operative society." "Co-operative agricultural or horticultural associations, instituted for * * * mutual help, * *. * may be formed, * * * by any number of persons, not less than three, engaged in agriculture." Section 5599, Statutes 1921. "Ten or more persons may form a corporation for the purpose of conducting an agricultural * * * business upon a co-operative plan.. * * * " Section 5637, Statutes 1921. The word "co-operative" may not be used, except by corporations organized under article 19, chapter 34; but associations or corporations organized under article 16, chapter 34, for co-operative purposes also, may use a name which includes the word "co-operative," but shall have no capital stock (see section 5601, paragraph A, Stats. 1921), but expenses and necessary funds are to be raised as provided in section 5614, which is as follows:

"An association may provide for the payment of expenses, necessary in the performance of its service to its members, by the creation of a working fund or otherwise, through fees, dues, assessments, or charges for the services, to be fixed and collected in such manner as may be prescribed in the by-laws. Such fees, dues, assessments, or charges shall be limited to the amounts necessary to meet expenses already incurred, or reasonably estimated as essential to be incurred, by the association in conducting its operations. Whenever any association shall find that it has accumulated funds in excess of those necessary to meet expenses already incurred, or reasonably estimated as essential to be incurred, by it in conducting its operations, it shall return such excess to, or deduct it from future fees, dues, assessments, or charges of the members who contributed to such excess, in the proportions of their respective contributions."

The purposes of these two acts, as contained in chapter 34, articles 16 and 19, is to promote co-operative action among those engaged in agricultural pursuits and matters relating and pertaining to those so engaged for mutual benefit, rather than for general commercial gain or profit. The plan under article 19, chapter 34, contemplates financial aid in a small way, by not restricting stock membership to those engaged in agriculture, extending such opportunity to everybody until such financial need for such co-operative business is met. Such plan does not contemplate unusual profits on such investment to any one, as the total annual dividend on the paid-up stock is restricted to 8 per cent., whilst the highest legally permitted annual rate of interest in this state is 10 per cent. After annually setting aside not less than 10 per cent. for surplus until a 50 per cent. surplus fund is accumulated, and 5 per cent. annually for educational purposes, obviously to promote co-operative organizations among farmers, etc., and 8 per cent. dividend on paid-up capital stock if it is then available the remainder of the net earnings are annually to be paid to the members ratably, not upon the amount of their paid-up capital stock, but upon the amount of the products sold or furnished to the corporation by its members and purchased by them from it, and in this case also to the nonmembers upon amounts of purchases and sales from or to the corporation. A stockholder, who was not a patron of the gin, either by furnishing or selling to it seed cotton, or buying cotton or seed from it, could never realize more than 8 per cent. annually on his

investment, but has his paid-up stock membership under such conditions for the purpose of promoting agriculture by furnishing a small sum of capital for farmers to install and operate their own gins in a co-operative way.

These two plans appear to be comprehensive: (1) That under article 16, by means of which dues and assessments and other funds are to be supplied by the agricultural members of the co-operative or mutual association to finance same; and (2) that under chapter 19, where outside financial assistance, under the dividend restrictions heretofore noted, might be obtained, but in a limited way, so that no nonfarmer or agriculturist could ever own more than 5 per cent. of the outstanding paid-up capital stock, and not more than $500 of the same, and no stockholder is permitted to vote more than one vote at any stockholders' meeting. If the indebtedness of such corporation shall at any time exceed the amount of its subscribed stock and surplus, the directors assenting thereto are made personally and individually liable for such excess to the creditors. Section 5647. Where dividends or apportionments of the earnings or profits to members or nonmembers are made by the directors when such corporation is insolvent, or when it would be rendered insolvent by such payment, such directors are jointly and severally liable for any debts of the corporation then existing and for all such debts as shall thereafter be incurred while they shall continue in office. Section 5649, Stat. 1921.

[4] It was the evident purpose of the Legislature, in enacting these two articles, to provide in a comprehensive way for co-operative organizations for the handling and marketing of crops of agriculture, that such producers should realize a reasonable value for their crops. Had the Legislature confined the shareholders under article 19 to agricultural producers, but permitted farmers not patrons of the gin to acquire stock, it would have probably been contended that the act on its face discriminates against other investors, in that it permitted farmers, who were not intended to be patrons of such co-operative organizations, to furnish limited capital upon which they were to receive maximum dividends at the rate of 8 per cent. per annum, when persons of other classes were not eligible to so invest, and with that in mind this limited capital, which was to be made available for the purpose of enabling agriculturists to organize and carry on these co-operative concerns in the promotion of agriculture, was by the Legislature left open to

every investor, whether a cotton oil corporation or other private corporation, or a firm or individual owning gins, or stockholders in such enterprise.

To promote, foster, and encourage intelligent and orderly marketing of agricultural products through co-operative concerns, under a co-operative plan, eliminating speculation and waste, and making the distribution of agricultural products between producer and consumer or manufacturer as direct as can be efficiently done, these acts as contained in chapters 16 and 19 were passed. Courts will take judicial knowledge of conditions affecting the agricultural interests of the country. Tobacco Growers' Co-op. Ass'n v. Jones, 185 N. C. 265, 117 S. E. 174, 33 A. L. R. 231; Liberty Warehouse Co. v. Burley Tobacco Growers' Co-op. Ass'n, 208 Ky. 643, 271 S. W. 695; Minnesota Wheat Growers' Co-op. Marketing Ass'n v. Huggins, 162 Minn. 471, 203 N. W. 420. The members of the Legislature from the various counties and districts of the state carried to their deliberations knowledge of such conditions in each portion thereof in considering such legislation. Congress has repeatedly legislated upon matters in which they recognized rights of the producer who might desire to manufacture or market his own product. The federal income statute of 1921 (section 231) exempts farmers' co-operative associations, such as may be organized under chapters 16 and 19, from income tax payment.

The ordinary commercial ginner within the state of Oklahoma may gin either as an individual, a copartnership, or a corporation; no statute, rule, or provision of law restricts him in any wise in the enjoyment of the full proceeds of the earnings under the rate fixed. He usually is engaged, not only in ginning cotton, but also in the purchase of seed cotton, cotton seed after he has ginned the cotton, and frequently in the purchase of cotton after it is ginned for profit. A ginner has a greater facility to purchase the seed than any one else. As he gins the cotton, he catches the seed as they fall from the stand, and has the immediate means for storage and housing same. The patron, if he does not elect to sell to the ginner, must receive them and haul them away, when as a rule he has no place for storage for accumulating as much as a carload, so as to sell them to advantage. A great per cent. of the gins so operated are owned and controlled by cotton seed crushers, operating cotton seed oil mills within the state of Oklahoma; such operation of gins not being entirely for the purpose of rendering a public service, but also

for collecting cotton seed at a central point. Their gin business as ginners is incidental to that as crushers of seed, to the end that they may be enabled to purchase the seed under favorable conditions. See Choctaw Cotton Oil Co. v. Corporation Commission, 121 Okl. 51, 247 P. 390; Planters' Cotton & Ginning Co. v. West, 82 Okl. 145, 198 P. 855.

In the answer to the bill filed in this case it is alleged that complainant made an average profit on cotton gins in which he was interested in the preceding year of as much as 85 per cent. In the affidavit filed by the plaintiff in this case on preliminary hearing, which is a part of the record, he sets forth that the Choctaw Cotton Oil Company, which is a seed-crushing organization, operates gins within the county of which Durant is the county seat, in the towns of Bennington, Bokchito, Caddo, Kemp, and Kenefic, and that the Choctaw Gin and Choctaw Electric Gin Companies also operated at Durant.

A gin organized under the act of 1919, "to be run co-operatively," does not render said proviso repugnant to the Fourteenth Amendment to the federal Constitution. In C., B. & Q. R. Co. v. Iowa, 94 U. S. 155, 24 L. Ed. 94, it is said:

"The statute divides the railroads of the state into classes, according to business, and establishes a maximum of rates for each of the classes. It operates uniformly on each class, and this is all the Constitution requires. The Supreme Court of the state, in the case of McAunich v. M. & M. R. R. Co., 20 Iowa, 343, in speaking of legislation as to classes, said: 'These laws are general and uniform, not because they operate upon every person in the state, for they do not, but because every person who is brought within the relation and circumstances provided for is affected by the law. They are general and uniform in their operation upon all persons in the like situation, and the fact of their being general and uniform is not affected by the number of persons within the scope of their operation.' This act does not grant to any railroad company privileges or immunities which, upon the same terms, do not equally belong to every other railroad company. Whenever a company comes into any class, it has all the 'privileges and immunities' that have been granted by the statute to any other company in that class. It is very clear that a uniform rate of charges for all railroad companies in the state might operate unjustly upon some. It was proper, therefore, to provide in some way for an adaptation of the rates to the circumstances of the different roads; and the General Assembly, in the exercise of its leg-

islative discretion, has seen fit to do this by a system of classification. Whether this was the best that could have been done is not for us to decide. Our province is only to determine whether it could be done at all, and under any circumstances. If it could, the Legislature must decide for itself, subject to no control from us, whether the common good requires that it should be done."

In Crescent Cotton Oil Co. v. Mississippi, 257 U. S. 129, 42 S. Ct. 42, 66 L. Ed. 166, it is said:

" * * * The law assailed was enacted by the state in the exercise of its police power, to prevent a practice conceived to be promotive of monopoly with its attendant evils. It is clearly settled that any classification adopted by a state in the exercise of this power which has a reasonable basis, and is therefore not arbitrary, will be sustained against an attack based upon the equal protection of the laws clause of the Fourteenth Amendment, and also that every state of facts sufficient to sustain such classification which can be reasonably conceived of as having existed when the law was enacted will be assumed. Lindsley v. Natural Carbonic Gas Co., 220 U. S. 61 [31 S. Ct. 337, 55 L. Ed. 369, Ann. Cas. 1912C, 160], and cases cited; Rast v. Van Deman & Lewis Co., 240 U. S. 342 [36 S. Ct. 370, 60 L. Ed. 679, L. R. A. 1917A, 421, Ann. Cas. 1917B, 455]. The record before us shows that, before the law assailed was enacted, cotton gins had been operated in Mississippi by individuals as well as by corporations; but there is no showing that oil mills and cotton gins were both operated by an individual or by groups of individuals, and we think it may well be assumed, under the rule stated, that because of the larger capital required, and perhaps for other reasons, oil mills and cotton gins may have been operated in that state, only by corporations, and that for this reason the restraint of the evil aimed at by the act of the Legislature could be accomplished by controlling corporations only. Assuming this to be the fact when the law was enacted, obviously the classification objected to cannot be pronounced so without reasonable basis as to be arbitrary."

In Middleton v. Texas Power & Light Co., 249 U. S. 152, 39 S. Ct. 227, 63 L. Ed. 527, it is said:

"There is a strong presumption that a Legislature understands and correctly appreciates the needs of its own people, that its laws are directed to problems made manifest by experience, and that its discriminations are based upon adequate grounds. The equal

protection clause does not require that state laws shall cover the entire field of proper legislation in a single enactment. If one entertained the view that the act might as well have been extended to other classes of employment, this would not amount to a constitutional objection. Rosenthal v. New York, 226 U. S. 260, 271 [33 S. Ct. 27, 57 L. Ed. 212, Ann. Cas. 1914B, 71]; Patsone v. Pennsylvania, 232 U. S. 138, 144 [34 S. Ct. 281, 58 L. Ed. 539, 543]; Missouri, Kansas & Texas Ry. Co. v. Cade, 233 U. S. 642, 649, 650 [34 S. Ct. 678, 58 L. Ed. 1135, 1138]; International Harvester Co. v. Missouri, 234 U. S. 199, 215 [34 S. Ct. 859, 58 L. Ed. 1276, 1283, 52 L. R. A. (N. S.) 525]; Keokee Consol. Coke Co. v. Taylor, 234 U. S. 224, 227 [34 S. Ct. 856, 58 L. Ed. 1288]; Miller v. Wilson, 236 U. S. 373, 384 [35 S. Ct. 342, 59 L. Ed. 628, 632, L. R. A. 1915F, 829]. The burden being upon him who attacks a law for unconstitutionality, the courts need not be ingenious in searching for grounds of distinction to sustain a classification that may be subjected to criticism."

In Chicago, Rock Island & Pacific Railway Co. v. D. J. Perry, 259 U. S. 548, 42 S. Ct. 524, 66 L. Ed. 1056, it is said:

"We are not advised of the precise reasons why the Legislature chose to put the policy of this statute into effect as to public service corporations, without going further; nor is it worth while to inquire. It may have been that the public had a greater interest in the personnel of the public service corporations, or that the legislature deemed it expedient to begin with them as an experiment, or any one of a number of other reasons. It was peculiarly a matter for the Legislature to decide, and not the least substantial ground is present for believing they acted arbitrarily. We feel safe in relying upon the general presumption that they 'knew what they were about.' Middleton v. Texas Power & Light Co., 249 U. S. 152 [39 S. Ct. 227, 63 L. Ed. 527]."

In Omaechevarria v. Idaho, 246 U. S. 343, 38 S. Ct. 323, 62 L. Ed. 763, it is said:

"We cannot say that the measure adopted by the state is unreasonable or arbitrary. It was found that conflicts between cattle rangers and sheep herders on the public domain could be reconciled only by segregation. In national forests, where the use of land is regulated by the federal government, the plan of segregation is widely adopted. And it is not an arbitrary discrimination to give preference to cattle owners in prior occupancy, without providing for a like preference to sheep owners in prior occupancy. For experience shows that sheep do not require pro-

tection against encroachment by cattle, and that cattle rangers are not likely to encroach upon ranges previously occupied by sheep herders. The propriety of treating sheep differently than cattle has been generally recognized."

The gin is to be operated co-operatively, and is thereby placed in a classification by the Legislature of the state. We do not reach a conclusion that such a classification is so unreasonable that it should be judicially annulled. If it is organized under the statute making that classification, and is so operated, the fact that others besides growers and producers are permitted to become incorporators does not operate to render the classification violative of the Fourteenth Amendment. They are limited as to amount of stock and voting participation and as to profits. The purpose of the law and the trend of contemporary thought of lawgivers and expressions of courts alike is to encourage co-operative dealing in the products of agriculture.

The complainant rests his case under the contention of a violation of the federal constitutional provision guaranteeing equal protection of the law, which seems to be without substantial merit. As to whether the complainant operates his gin under a franchise or license that is not essential to determine. In Oklahoma perpetual and exclusive franchises are prohibited. Oklahoma Constitution, article 2, section 32; article 5, section 51; and article 18, section 7. In Boise City Artesian Hot & Cold Water Co. v. Boise City (9th C. C. A.) 123 F. 232, it is held that an ordinance granting right to lay and repair water pipes in the streets and alleys of the city, but without fixing any term for the privilege, is a grant of a license only, revocable at the will of the city, since it had no power to grant a perpetual franchise; and that appears to be the rule supported by the weight of authority. It is assumed that complainant may maintain this action under such status, if the proviso assailed by him is void, but we conclude that he did not have such a vested right as to prevent the passage of said proviso, if it does not amount to an arbitrary or unreasonable classification.

That the question has become moot is untenable, as the Durant Co-operative Gin Company is a party to this action. Complainant's bill should be dismissed.

VAN VALKENBURGH, Circuit Judge, concurs.

COTTERAL, District Judge, concurs in the conclusion.